2019 IL App (3d) 150880

Opinion filed July 23, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0880 |
| v. | ) ) | Circuit No. 12-CF-1799 |
| JAMES A. PACHECO, | ) ) | Honorable Carla Alessio-Policandriotes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McDADE delivered the judgment of the court.
Justice Wright, specially concurring, with opinion.
Presiding Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1 Defendant, James A. Pacheco, pled guilty to criminal damage to property. Following a

jury trial, defendant was convicted of aggravated assault, aggravated fleeing or attempting to

elude a peace officer, and driving under the influence of alcohol (DUI). On appeal, defendant

argues (1) the trial court erred in replaying video and audio recordings in the courtroom in the

presence of the parties and trial judge rather than in the jury room during jury deliberations,

(2) the trial court violated defendant's right to confrontation by limiting his cross-examination of

a police officer, (3) the trial court abused its discretion in granting the State's motion *in limine* to

bar defense counsel from questioning two police officers about their failure to write police reports, (4) the State engaged in prosecutorial misconduct during closing argument, and (5) defendant is entitled to monetary credit for time spent in presentence custody in the amount of $1410. We reverse defendant's convictions and remand the matter for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        The State charged defendant with aggravated assault (720 ILCS 5/12-2(b)(4)(i), (c)(8) (West 2012)) in that he operated a motor vehicle in a manner which placed Adam Stapleton in reasonable apprehension of being struck by the vehicle. The State also charged defendant with attempted aggravated battery (*id.* §§ 8-4(a), 12-3.05(d)(4)(i)) in that he attempted to make physical contact of an insulting or provoking nature with Stapleton by driving a vehicle toward Stapleton. The indictment alleged defendant knew Stapleton to be a police officer engaged in the performance of his official duties during these offenses.

¶ 4        The State also charged defendant with aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(4) (West 2012)), criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2012)), and two counts of DUI (625 ILCS 5/11-501(a)(1), (a)(2) (West 2012)).

¶ 5        Defendant filed a motion to suppress evidence, which the court ultimately denied. At the hearing on the motion to suppress, Stapleton testified that he did not write a police report in connection with the instant case. Stapleton stated: "It was explained to me the only thing that I was to do with anything with the case was to give a statement, a video and audiotaped statement, after the incident." Stapleton said that it was customary for officers to write police reports unless there was an officer-involved shooting, which occurred in this case. Defense counsel asked Stapleton why that situation was different. Stapleton replied: "Because of the protection by our union, legal protection, things of that nature." Stapleton said he believed it was also the police

- 2 -

department's policy. Officer Eric Zettergren also testified that he did not write a police report. Zettergren explained: "I believe it is the department's policy that if you're involved in an incident like this you just give a statement." Defense counsel asked Zettergren if he was ordered by his supervisor not to write a report. Zettergren replied: "I don't know if I'm specifically ordered not to, but that's just the way it has been done."

¶ 6      The State filed a motion *in limine* to bar defendant from eliciting any testimony or evidence regarding the absence of police reports written by Stapleton and Zettergren. The motion alleged that the police department's regulations prohibited Stapleton and Zettergren from writing reports involving the incident because Stapleton discharged a firearm during the incident.

¶ 7      At a hearing on the motion *in limine*, the State noted that Stapleton and Zettergren testified at the suppression hearing that they had been prohibited from writing reports because Stapleton had discharged a firearm. Defendant argued that he should be permitted to cross-examine Stapleton and Zettergren about their failure to write police reports. Defense counsel argued that the police department policy manual was "ambiguous as to whether a police officer should make a report." Defense counsel read a portion of the policy manual stating that an officer who discharges a firearm was to write a report unless physically unable. Defense counsel noted that another section of the manual said that the watch commander would designate a second officer other than the officer involved in the incident to complete a report.

¶ 8      The court granted the motion *in limine*. The court reasoned that if it was the police department's policy to preclude officers from writing reports in the event of a shooting, then the officers had no discretion as to whether they wrote reports. The court found that absent any discretion on the part of the officer, failing to write a report in this situation was not a bad act and did not indicate that the officer was biased. The court stated that the officers were not in a

position to interpret the written regulations presented by defense counsel and stated that an officer probably would not even know that the document existed. The court indicated that it would reconsider its ruling if the parties could provide evidence that the officers were not told they could not write police reports. The court suggested that the parties call a police official and ask about the situation. Neither party made any further representations to the court on the matter.

¶ 9    Defendant pled guilty to criminal damage to property. The matter proceeded to a jury trial on the remaining charges.

¶ 10    At the trial, Ralph Gallup; his son, Jonathan Gallup; and their neighbor, Reginald Phillips, testified that they heard the sound of glass breaking at approximately 2:20 a.m. on July 30, 2012. They observed a black car in the alley behind their residences and saw that defendant was driving the car. Jonathan saw that the windows of Ralph's truck were broken. Jonathan or Ralph called the police. Defendant drove his car to the end of the alley, which was a dead end. Ralph drove his truck into the middle of the alley to prevent defendant from leaving. Defendant exited his vehicle and looked around for a few minutes. Defendant then reentered his vehicle and drove through a yard onto Union Street.

¶ 11    Stapleton testified that he was working with Zettergren at approximately 2:20 a.m. on the day of the incident. Stapleton was driving the squad car. They received a report of criminal damage to property committed by a white male driving a black Nissan. While the officers were driving to the scene of the complaint, they encountered a black Nissan that matched the description from the complaint. It was later determined that defendant was driving the vehicle. Stapleton activated his overhead lights and followed the vehicle.

¶ 12    Defendant stopped his vehicle after Stapleton activated his overhead lights. The officers exited their squad car, and defendant drove away. The officers returned to the squad car and

- 4 -

began pursuing defendant. Stapleton activated his siren and used the squad car's public address system numerous times to tell defendant to stop his vehicle. Defendant continued driving at a high rate of speed and committed several traffic violations. The officers continued to follow defendant.

¶ 13    Eventually, the roadway was blocked by a train near the Filtration Group, and defendant was unable to continue. Stapleton drove his squad car so that it was parallel with defendant's stopped vehicle. Stapleton believed that defendant had given up running from the officers. He exited his squad car and told defendant to stop his car. Defendant said "what the f*** did you pull me over for" and that he did not do anything. Stapleton was standing at the back corner of the driver's side of his squad car. Zettergren also exited the squad car, and Stapleton lost sight of him.

¶ 14    Defendant began backing up his vehicle. Stapleton repeatedly told defendant to stop his vehicle. Defendant's vehicle stopped and then started to roll forward as if defendant had taken his foot off the brake. Defendant's vehicle then turned toward Stapleton and began to accelerate. Stapleton backed up and repeatedly ordered defendant to stop the vehicle. Defendant's vehicle continued to accelerate toward Stapleton. Stapleton did not believe he had time to move out of the way and was afraid that he was going to be killed. Stapleton discharged his firearm in the direction of defendant and fired seven rounds. Stapleton knew he was standing in front of defendant's vehicle when he discharged his firearm, but he did not remember if he was positioned in the center or to the left of the vehicle. After Stapleton discharged his firearm, he was able to move out of the way of defendant's vehicle. Defendant then fled the scene at a much higher rate of speed than when he accelerated toward Stapleton. Stapleton and Zettergren reentered the squad car and continued pursuing defendant.

¶ 15          The State introduced an audio recording of the encounter captured by surveillance equipment at the Filtration Group into evidence and played it for the jury. A voice could be heard yelling, "I didn't do anything." Another voice repeated "stop the car" several times. Seven gunshots could then be heard. The gunshots began approximately one second after the voice said "stop the car" for the last time. After that, a vehicle could be heard accelerating. Then, sirens and the sound of another vehicle accelerating could be heard. Defendant introduced a second audio recording of the incident into evidence, which captured the same events as the first recording.

¶ 16          The State also introduced a video recording of the encounter into evidence, which was also captured by surveillance equipment at the Filtration Group. The State played the video recording for the jury. The video recording contained some audio, but it was not as clear as the separate audio recordings. The image was grainy. In the video recording, a parked semitruck could be seen. A dark-colored vehicle drove past the semitruck. A squad car with its sirens and lights activated followed closely behind the dark-colored car. The two vehicles drove off the screen, and voices could be heard. Seven gunshots could then be heard in rapid succession. While the gunshots could be heard, the dark-colored vehicle drove back onto the screen and an individual could be seen running in front of the dark-colored vehicle. This individual was close to the dark-colored vehicle when he first appeared on the screen. The individual ran away from the vehicle. The gunshots began when the vehicle was off the screen and continued as the vehicle drove into the view of the camera. The vehicle drove away. Approximately 15 to 20 seconds later, the squad car followed. Stapleton testified that he was the individual running in the video.

¶ 17          The State asked Stapleton if he discharged his firearm while taking cover behind the trunk of his squad car, and Stapleton said no. Stapleton said that he was not standing close to his

squad car when he discharged his firearm. Stapleton testified that he was standing in front of defendant's vehicle the entire time he discharged his firearm.

¶ 18        During cross-examination, defense counsel asked Stapleton: "Now, what caused you to fire is *** there was a sudden turn in the vehicle towards you and it accelerated at a high rate of speed. It was at that point in time you feared for your safety and fired your firearm, is that correct?" Stapleton replied, "I didn't say a high rate of speed. I said the vehicle had accelerated towards me." Defense counsel asked Stapleton if he was aiming for defendant when he was discharging his firearm at the vehicle. Stapleton said yes. Defense counsel asked Stapleton if he was trying to kill or wound defendant, and Stapleton said no. Stapleton said, "I was firing the rounds to stop the threat that was coming at me." Defense counsel asked, "If you are firing the weapon to stop the car, what did you hope would happen by firing the weapon that would cause the car to stop?" Stapleton replied, "That it would either change directions or stop." Stapleton acknowledged that if he had shot defendant in the head, defendant could have become unconscious and unable to control the vehicle.

¶ 19        Stapleton testified that he and Zettergren pursued defendant after the shooting. Initially, there were two other squad cars in front of them, but Stapleton passed them so that he would lead the pursuit. Stapleton testified that defendant drove through a red light and failed to stop at a stop sign while driving through a residential area. At one point, Stapleton was driving 80 miles per hour in pursuit of defendant. Eventually, defendant struck a traffic signal pole and stopped. Stapleton exited his squad car.

¶ 20        Stapleton told defendant to open the door of his vehicle, but defendant did not comply. Stapleton wanted to remove defendant from the vehicle as quickly as possible so that he could not harm anyone else. Defendant's vehicle was still running after it crashed. Stapleton broke the

window of defendant's vehicle and opened the door. Stapleton twice told defendant to exit the vehicle, but he refused. Stapleton twice tried to pull defendant out of the vehicle, but defendant resisted. Defendant was bleeding and said he had been shot. Stapleton deployed his taser, and the officers were able to remove defendant from the vehicle. Defendant was lying on the ground, but he was still fighting with the officers. Defendant refused to put his arms behind his back so the officers could place him in handcuffs. Defendant pulled his arms away from the officers. Stapleton activated his taser a second time. Other officers then gave defendant medical attention.

¶ 21    In the middle of defense counsel's cross-examination of Stapleton, the parties had a discussion outside the presence of the jury. Defense counsel stated that he planned to ask Stapleton whether he would lose his job if he improperly used deadly force. Defense counsel argued that Stapleton's potential fear of losing his job could provide a motive to testify falsely. The State argued that it would be improper for defense counsel to argue that Stapleton had "motive to testify falsely out of a desire or motivation to protect his job." The court agreed, reasoning that, pursuant to the holding in *People v. Adams*, 2012 IL 111168, "[y]ou cannot tie perjury or sworn testimony to employment in a criminal case."[1]

¶ 22    Zettergren testified that he and Stapleton pursued defendant's vehicle until it stopped where the train was blocking the road. Zettergren exited the squad car and went to the front passenger side of the squad car. Defendant began backing up his vehicle. Zettergren and Stapleton yelled at defendant to stop his vehicle. Defendant continued to back up his vehicle. Defendant then stopped his vehicle as it was directly facing Zettergren. The vehicle rolled forward and increased in speed. Zettergren did not know whether defendant had only removed

---

[1]The court described the factual scenario presented in *Adams*, 2012 IL 111168, but did not identify the case by name. It was later established that *Adams* was the case the court was referring to.

his foot from the brake or whether defendant's foot was on the gas pedal. Defendant turned the vehicle to the left toward the rear of the squad car, away from Zettergren.

¶ 23    Zettergren vaguely knew Stapleton's location at that time. He could hear Stapleton's voice moving from the front of the squad car to the back. Stapleton was giving defendant commands to stop the vehicle. Zettergren saw defendant's vehicle accelerate. Zettergren stated that there was a visible and audible increase in the speed of defendant's vehicle. Stapleton gave more commands. Zettergren then heard shots being fired. He could not see Stapleton at that point. He then saw defendant's vehicle flee the area.

¶ 24    Michael McAbee, a semitruck driver, testified that he and his son, Jamie Kirk, were sleeping on bunks in McAbee's semitruck in the early morning hours on the date of the incident. The truck was parked at the Filtration Group. They were waiting for the plant to open to drop off their freight. At approximately 2:45 a.m., McAbee heard sirens, which woke him up. He saw a black car drive up to train tracks where a train was parked. A squad car then passed his truck and stopped. The black car could not get around the train, and it turned around slowly, "like an old person." When the black car turned around, the squad car pulled up at an angle to it. Two police officers exited the squad car. The officers yelled at the driver of the black car several times, telling him to stop his vehicle. The black car was facing the squad car at a 30-degree angle. One of the officers walked to the front of the squad car, and the other officer went to the back.

¶ 25    The black car backed up and then started driving back in the direction from which it had come. The police officers were still yelling at the driver of the black car. They told him to "stop the f'ing car or they gonna shoot." At one point, the driver of the black car yelled at the officers to get out of his way. The driver did not otherwise respond to the officers. One officer drew his gun and yelled at the driver to stop the vehicle. McAbee could see the officer "a little bit" at that

point. The black car did not stop. Rather, "he acted as an old person; drove easy." McAbee heard gunshots and covered his face. After the gunshots stopped, McAbee lay down for a few minutes. When he looked up, both vehicles were gone.

¶ 26    Kirk testified that he was 19 years old. In the early morning hours on the date of the incident, Kirk was sleeping on the top bunk of McAbee's semitruck. He heard McAbee exclaim, and he woke up. He saw a black car in front of the semitruck and a squad car to the left of the truck. A train was blocking the road. The black car was facing away from the train toward the squad car. Kirk saw one police officer standing by the squad car on the driver's side near the trunk. The officer told the man driving the black car "to stop the car or he'd effing shoot." The officer was holding a gun. The State asked Kirk if he could hear the individual in the black car say anything. Kirk replied: "If I'm not mistaken, I heard him say to the cop to get the—out of his way, F-word." Kirk testified that he saw the officer point his gun at the black car. The black car remained stationary and did not move until after the officer fired his gun. Kirk stated that it was possible that the black car was moving so slowly that he could not tell if it was moving. Kirk believed the officer fired six shots. The black car then drove away slowly.

¶ 27    A firefighter paramedic testified that he responded to the scene of defendant's motor vehicle collision. The paramedic transported defendant to the hospital in an ambulance. A phlebotomist testified that she drew defendant's blood when he was taken to the hospital. The phlebotomist took the blood to the hospital's laboratory for testing. The tests showed that defendant's blood alcohol content was 0.183.

¶ 28    Police officer Chris Delaney testified that he was a crime scene technician. Delaney photographed defendant's vehicle after the incident. The photographs showed that there were six bullet holes in defendant's windshield and one bullet hole on the hood of the vehicle. Delaney

had placed wooden rods through a few of the bullet holes. In three of the photographs, the wooden rod appeared to be entering a bullet hole on the hood of the vehicle from the front. In one photograph, the wooden rod appeared to be entering the same bullet hole from the side. Delaney stated that he did not move the rod. Rather, the photographs looked different because they were taken from different vantage points. Delaney stated that the purpose of the wooden rods was to "show perspective of the holes." The rods did not represent an exact trajectory of the bullets. Rather, it was "a guess as to where the bullet may have entered and its possible path." Delaney was not a shooting reconstructionist.

¶ 29    The State rested. Defense counsel asked the court to revisit its ruling on the issue of whether defense counsel could question Stapleton as to whether he believed the shooting could have a potential negative impact on his employment. Defense counsel stated that he wanted to recall Stapleton as a witness and ask this question. Defense counsel argued that he would be asking Stapleton if his actions on the day of the incident gave him a reason to lie, which was "just good 'ol fashion cross examination." Defense counsel argued that the instant case was distinguishable from *Adams*. The court upheld its ruling that it would not allow such questioning or argument.

¶ 30    Police officer Christopher D'Arcy testified that he pursued defendant's vehicle from the time of the shooting to the time the vehicle crashed into a traffic signal pole. D'Arcy's maximum speed during the pursuit was 55 miles per hour. D'Arcy saw defendant's vehicle crash. D'Arcy exited his squad car and stood 10 to 15 feet away from the scene of the crash with his canine. Other officers commanded defendant to exit the vehicle, but defendant did not comply. D'Arcy could not recall if defendant's vehicle was running but stated that it appeared to be inoperable. D'Arcy saw Stapleton deploy his taser. D'Arcy stated that defendant's failure to comply with the

- 11 -

officers' verbal commands was the only behavior that required the use of the taser. After Stapleton deployed his taser, defendant exited the vehicle. Defendant displayed no unusual physical behavior that would require additional tasing.

¶ 31        During closing argument, defense counsel argued that the evidence did not establish that defendant made a blatant attempt to hit Stapleton with his vehicle after an audible and visual acceleration of defendant's vehicle. Defense counsel argued that although Stapleton testified that he was in front of defendant's vehicle when he discharged his firearm, the photographs of defendant's vehicle showed that the bullets entered from the side. Defense counsel pointed out several instances where he believed Stapleton's testimony was contradicted by the testimony of other witnesses, particularly Officer D'Arcy. Defense counsel stated:

> "Ladies and gentlemen, I think the whole case boils down to credibility, credibility and an understanding of human nature. If you believe that Officer Stapleton was out of control that day, do not believe him. If you believe the officers are not consistent with each other, do not find [defendant] guilty. If you think Officer Stapleton was purposely abuseful, don't believe a word out of his mouth. If you think he was exaggerating here in Court, be offended, and then don't believe him. If you think he was acting to protect his own interests, don't believe him. If you think he lied when he said all the shots came from the front, don't believe him.

> And, ladies and gentlemen, if you don't believe him, if you don't believe the officers, some of the officers in this case, there is not proof beyond a reasonable doubt."

¶ 32    The State argued that Stapleton's testimony was credible. The State contended that Stapleton's actions on the day of the incident were motivated by a desire to do his job and to protect the community from defendant's actions.

¶ 33    During jury deliberations, the jury asked to have the video and audio recordings from the security cameras at the Filtration Group replayed. The jury also asked if there was any way to view the video recording in slow motion. The court asked the parties if they objected to replaying the recordings for the jury. The State said no. Defense counsel indicated that he did not object as long as the defense's audio recording was played along with the State's audio and video recordings. The court stated that it appeared that the jury was asking for all three recordings to be played. The State indicated that it was not possible to play the video recording in slow motion. The following exchange occurred between the court and the parties:

"THE COURT: *** All right. What happens now since this is—we do not have the equipment in a jury room, we do not have equipment in here to bring it in. The jury has to come out into this courtroom and view what is on each of those video and audios from the filtration group. We know which three we are talking about, correct?

[DEFENSE COUNSEL]: Yes.

[ASSISTANT STATE'S ATTORNEY]: Yes.

THE COURT: No disagreement what we are talking about?

[DEFENSE COUNSEL]: Correct.

[ASSISTANT STATE'S ATTORNEY]: Correct.

THE COURT: So everybody else other than the attorneys, [defendant], *** and Court staff should be removed from the courtroom, please, so there is no interruption or any suggestion from any interruption during deliberations.

[DEFENSE COUNSEL]: Fair enough, [Y]our [H]onor.

* * *

THE COURT: *** Anyone else have any issue before I *** bring in the jury?

[ASSISTANT STATE'S ATTORNEY]: We are ready.

[DEFENSE COUNSEL]: Nothing from us, Judge."

¶ 34    The jury entered the courtroom. The court advised the jury that it would play the video and audio recordings in the courtroom, but it was not possible to play the video in slow motion. The court then played the video and audio recordings for the jury. The parties did not speak in the presence of the jury.

¶ 35    The jury found defendant guilty of aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI. The jury found defendant not guilty of attempted aggravated battery.

¶ 36    The court sentenced defendant to four years' imprisonment for aggravated assault and three years' imprisonment for aggravated fleeing or attempting to elude a peace officer, to be served concurrently. The court stated that it was entering "straight judgments of conviction" for criminal damage to property and DUI. The court stated that the sentences for criminal damage to property and DUI merged with the sentences for aggravated assault and aggravated fleeing or attempting to elude a peace officer. The court also imposed a fine in the amount of $2881.

¶ 37                                    II. ANALYSIS

- 14 -

¶ 38          A. Replaying Video and Audio Recordings in Open Court During Jury Deliberations

¶ 39          Defendant argues that error occurred where the court played the video and audio

recordings of the encounter in the courtroom in the presence of the parties during jury

deliberations rather than in the jury room. We find that the court's procedure for playing the

recordings constituted second-prong plain error.

¶ 40          Defendant concedes that he forfeited this issue by failing to object to the court's

procedure for playing the video and audio recordings during jury deliberations and for failing to

include the issue in a posttrial motion. Defendant requests that we review this issue under both

prongs of the plain error doctrine.

> "The plain error doctrine permits a reviewing court to consider
> unpreserved error when (1) a clear or obvious error occurred and the evidence is
> so closely balanced that the error alone threatened to tip the scales of justice
> against the defendant, regardless of the seriousness of the error, or (2) a clear or
> obvious error occurred and the error is so serious that it affected the fairness of
> the defendant's trial and challenged the integrity of the judicial process, regardless
> of the closeness of the evidence." *People v. McDonald*, 2016 IL 118882, ¶ 48.

"The first step in a plain error analysis is to determine whether error occurred." *Id.*

¶ 41          "It is a basic principle of our justice system that jury deliberations shall remain private

and secret." *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 17. The purpose of this rule is to

protect jurors from improper influence. *Id.* Such influence may include third parties exerting a

chilling effect on the jury or improperly communicating with the jury, either verbally or through

body language. See *United States v. Olano*, 507 U.S. 725, 739 (1993) (holding that, in theory, the

presence of alternate jurors during deliberations could prejudice a defendant if the alternate

- 15 -

jurors actually participated in deliberations or if their presence exerted a chilling effect on the regular jurors). Jury intrusions are reviewed for prejudicial impact. *Johnson*, 2015 IL App (3d) 130610, ¶ 19. However, the United States Supreme Court has recognized that "[t]here may be cases where an intrusion should be presumed prejudicial." *Olano*, 507 U.S. at 739.

¶ 42    Here, a clear or obvious error occurred where the court required the jury to view and listen to the video and audio recordings in the courtroom in the presence of the parties, their attorneys, and the trial judge because the presence of these third parties chilled jury deliberations. "[I]t is hard to imagine a more intrusive, more chilling presence in the deliberations than the opposing parties—the defendant with his attorney and the State in the person of the State's Attorney—and the trial judge." *Johnson*, 2015 IL App (3d) 130610, ¶ 49 (McDade, P.J., dissenting). The parties and their attorneys are not neutral entities. *Id.* ¶ 50. Rather, they have a substantial interest in the outcome of the litigation. *Id.* While the trial judge is a neutral entity, it is reasonable to presume that the presence of a judge would be innately intimidating to an average citizen and juror. *Id.* ¶ 53. Given the lack of neutrality of the parties and the presumptively intimidating presence of the trial judge, this case presents a situation where the presence of third parties during jury deliberations gives rise to a presumption of prejudice.

¶ 43    Because the nature of this error supports a finding of presumed prejudice, we find that the error is structural such that the second prong of the plain error doctrine applies. Our supreme court has equated second-prong plain error with structural error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). A structural error is " 'a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *Id.* at 614 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). In the instant case, the integrity of the judicial process was undermined because the jury

deliberations were chilled by the presence of the trial judge and the parties while the video and audio recordings were replayed during jury deliberations.

¶ 44        We recognize that our position on this issue is inconsistent with the positions taken in the lead opinions in *Johnson*, 2015 IL App (3d) 130610, and *People v. McKinley*, 2017 IL App (3d) 140752, in which this court considered similar issues. For the reasons we have previously discussed, we respectfully disagree with the lead opinions in those cases.

¶ 45        We reject the State's argument that this issue is not subject to plain error review because defendant waived any objection to the procedure used by the trial court for playing the video and audio recordings during jury deliberations. "Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right." *People v. Bowens*, 407 Ill. App. 3d 1094, 1098 (2011). The plain error doctrine applies in cases involving procedural default but not in cases involving affirmative acquiescence. *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12.

¶ 46        In the instant case, defense counsel's remarks during the parties' discussion of the jury's request to have the audio and video recordings replayed did not show affirmative acquiescence to playing the recordings in the courtroom rather than the jury room. Rather, defense counsel's remarks showed that he agreed as to which exhibits the jury wanted to be replayed and to everyone being removed from the courtroom while the recordings were played except for defendant, the attorneys, and the court staff. Because the record showed that defense counsel merely failed to object to having the recordings played in the courtroom rather than affirmatively agreeing to it, the issue was forfeited rather than waived. Accordingly, plain error review is appropriate in this case. See *id.*

- 17 -

¶ 47        Finally, in addressing this issue, we would be remiss if we did not note that errors of this repetitive nature could be easily remedied by the trial court having a laptop computer without Internet access or some other portable media player available in the jury room.

¶ 48        Reversal of defendant's convictions for aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI is warranted on the jury deliberation issue alone. However, we will proceed to address the merits of two additional issues raised by defendant that are likely to recur in the event of a new trial—namely, that the court improperly limited defense counsel's cross-examination of Stapleton and that the court abused its discretion in barring defense counsel from questioning Stapleton and Zettergren regarding their failure to write police reports. We will also briefly address defendant's arguments that the State committed prosecutorial misconduct during closing argument and that defendant is entitled to monetary credit against his fines for time spent in presentence custody.

¶ 49                        B. Limiting Cross-Examination of Stapleton

¶ 50        Defendant argues that the trial court erred in limiting defense counsel's cross-examination of Stapleton. Specifically, defendant argues that the court erred in barring defense counsel from cross-examining Stapleton about the potential consequences of an unjustified shooting and from arguing that Stapleton might have been motivated to lie about the incident out of a desire to protect his job. Defendant contends that this limitation on his cross-examination of Stapleton violated his right to confront the witnesses against him under the United States Constitution and the Illinois Constitution. Alternatively, defendant argues that even if his constitutional right to confrontation was not violated, the court abused its discretion in limiting defendant's cross-examination of Stapleton. We find that the trial court's limitation on defense

counsel's cross-examination of Stapleton violated defendant's right to confrontation, and accordingly, we do not reach defendant's alternative argument.

¶ 51                                         1. Standard of Review

¶ 52           Initially, we find that defendant's confrontation clause claim is subject to a *de novo* standard of review. See *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009) ("[D]efendant's claim that his sixth amendment confrontation rights were violated involves a question of law, which we review *de novo*."); *People v. Connolly*, 406 Ill. App. 3d 1022, 1027 (2011) ("A sixth amendment confrontation clause violation claim is a question of law that we review *de novo*.").

¶ 53           We reject the State's contention that defendant's confrontation claim is subject to an abuse of discretion standard of review. The State cites *People v. Kliner*, 185 Ill. 2d 81, 130 (1998), in support of its position. The *Kliner* court stated:

> "A criminal defendant has a fundamental constitutional right to confront the witnesses against him, which includes the right to cross-examination. [Citations.] Any permissible matter which affects the witness's credibility may be developed on cross-examination. [Citation.] *** Nevertheless, the latitude permitted on cross-examination is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant." *Id.*

Despite the *Kliner* court's reference to the constitutional right of confrontation, we find that the court was setting forth the standard of review for a common-law evidentiary claim regarding restriction of cross-examination.

¶ 54           Were we to interpret *Kliner* to mandate an abuse of discretion standard for confrontation claims involving limitations on cross-examination, it would be difficult to reconcile *Kliner* with

- 19 -

the supreme court's later decision in *People v. Blue*, 205 Ill. 2d 1 (2001). In *Blue*, the court stated:

> "We have noted repeatedly that the court enjoys discretion to impose reasonable limits on *** cross-examination to assuage concerns about harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning [citation], but this discretionary authority arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause [citation]." *Id.* at 13.

The *Blue* court's statement that a court's discretionary authority to impose limitations on cross-examination arises only after the court has permitted sufficient cross-examination to satisfy the confrontation clause indicates that a constitutional confrontation claim should not be reviewed for abuse of discretion.

¶ 55                                    2. Right to Confrontation

¶ 56        We find that the trial court violated defendant's right to confrontation by barring defendant from questioning Stapleton regarding the potential negative consequences to his employment if the shooting were determined to be unjustified. "A defendant states a confrontation clause violation 'by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.' " *Id.* at 14 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). A "defendant has the right to inquire into a witness' bias, interest, or motive to testify falsely." *People v. Coleman*, 206 Ill. 2d 261, 278 (2002). "[T]he court should afford a defendant the widest latitude to establish the witness' bias or hostile motivation." *Blue*, 205 Ill. 2d at 14.

¶ 57        Here, defense counsel indicated that he wished to cross-examine Stapleton as to whether Stapleton feared he would lose his job if it were determined that he improperly used lethal force

when he shot defendant. This was a proper subject of cross-examination, as it went to Stapleton's potential bias or motive to testify falsely. By barring defense counsel from pursuing this line of questioning, the court improperly prevented defendant from " 'engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.' " *Id.* (quoting *Van Arsdall*, 475 U.S. at 680).

¶ 58 Notably, the trial court's reasoning for barring defense counsel from questioning Stapleton regarding his desire to protect his job was based entirely on the court's misreading of the holding in *Adams*, 2012 IL 111168, ¶ 20. The court believed that *Adams* stood for the broad proposition that "[y]ou cannot tie perjury or sworn testimony to employment in a criminal case." However, a careful reading of *Adams* shows that the holding was much narrower.

¶ 59 In *Adams*, a police officer testified that he found a bag of cocaine in the defendant's pocket when he was searching the defendant after arresting him. *Id.* ¶¶ 5-6. The defendant testified that there was no cocaine in his pocket; rather, when the officers were arresting him, they pointed to a plastic bag with a white substance lying on the ground and claimed it was his. *Id.* ¶ 8. On rebuttal, another officer testified that he saw the first officer remove the cocaine from the defendant's pocket. *Id.* ¶ 12. The prosecutor argued during closing argument that the officers would not " 'risk[ ] their jobs *** over 0.8 grams of cocaine.' " *Id.* ¶ 16. The court held that "[t]he prosecutor's comments *** were impermissible speculation, as no evidence was introduced at trial from which it could be inferred that the testifying officers would risk their careers if they testified falsely." *Id.* ¶ 20. The court further reasoned that the prosecutor's comments violated "the principle that 'a prosecutor may not argue that a witness is more credible because of his status as a police officer.' " *Id.* (quoting *People v. Clark*, 186 Ill. App. 3d 109, 115-16 (1989)).

¶ 60    Here, unlike in *Adams*, defense counsel was not speculating during closing argument that Stapleton was motivated to testify falsely to protect his job where there was no such evidence at trial. Rather, defense counsel was trying to elicit evidence that Stapleton was motivated to testify falsely through cross-examination. Also, unlike in *Adams*, defense counsel's potential argument that Stapleton had a motive to testify falsely to protect his job would not violate "the principle that 'a prosecutor may not argue that a witness is more credible because of his status as a police officer.' " *Id.* (quoting *Clark*, 186 Ill. App. 3d at 115-16). Defense counsel was not trying to tie Stapleton's credibility to his status as a police officer; rather, defense counsel sought to elicit evidence that Stapleton was motivated to testify falsely out of fear of negative consequences for specific actions he had taken.

¶ 61    Having found that the court violated defendant's right to confrontation in barring defense counsel from questioning Stapleton regarding a potential motive he may have had to testify falsely, we next consider whether this error was harmless beyond a reasonable doubt. Where a court denies a defendant the right of effective cross-examination under the confrontation clause, " '[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.' " *Blue*, 205 Ill. 2d at 14 (quoting *Van Arsdall*, 475 U.S. at 684). "In other words, the inquiry is 'whether the defendant would have been convicted regardless of the error.' " *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (quoting *People v. Dean*, 175 Ill. 2d 244, 259 (1997)).

    " 'Whether *** an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the

- 22 -

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " *Blue*, 205 Ill. 2d at 14 (quoting *Van Arsdall*, 475 U.S. at 684).

¶ 62    Applying the above factors to the instant case, we find that the court's order barring defense counsel from cross-examining Stapleton regarding the potential consequences to his employment if the shooting were determined to be unjustified was not harmless beyond a reasonable doubt. Stapleton's testimony that defendant accelerated his vehicle toward Stapleton prior to the shooting was crucial to the prosecution's case for aggravated assault and was not cumulative. This testimony was not directly corroborated by other evidence at trial. The video recording did not show defendant and Stapleton's locations or actions prior to the shooting. Rather, defendant's vehicle and Stapleton came into view of the security camera only after the shooting commenced. While Zettergren testified that there was a visible and audible increase in the speed of defendant's vehicle prior to the shooting, he could not see Stapleton at that time. Also, no acceleration could be heard on the audio recording prior to the shooting. Furthermore, Stapleton's testimony was contradicted by Kirk's testimony that defendant's vehicle remained stationary until after the shooting. Because Stapleton's testimony that defendant accelerated his vehicle toward him was not corroborated by other evidence and was contradicted by Kirk's testimony, the strength of the State's case for aggravated assault was not overwhelming.

¶ 63    Also, the cross-examination otherwise permitted by the court did not sufficiently allow defendant to present his theory that Stapleton had motivation to testify falsely in order to protect his employment. The court did not allow defense counsel to question Stapleton and Zettergren

- 23 -

about their failure to write police reports in this case, which would have supported this theory. See *infra* ¶¶ 68-69. While the defense was generally able to challenge Stapleton's credibility based on inconsistencies between his testimony and other evidence in the case, the defense was not able to present any *motivation* Stapleton may have had to testify falsely. Defense counsel stated during closing argument that the jurors should not believe Stapleton if they thought he was "acting to protect his own interests." However, the court's ruling limiting defense counsel's cross-examination of Stapleton precluded the defense from presenting a theory as to what Stapleton's interests were and why he might be motivated to protect his interests. The State, on the other hand, was able to argue extensively that Stapleton's only motivation was to do his job and keep the community safe.

¶ 64        Viewing all the above factors in totality, the court's improper limitation of defense counsel's cross-examination of Stapleton was not harmless beyond a reasonable doubt.

¶ 65    C. Barring Defense Counsel From Questioning Officers About Failure to Write Police Reports

¶ 66        We next address defendant's argument that the trial court abused its discretion in barring defense counsel from questioning Stapleton and Zettergren about their failure to write police reports regarding their encounter with defendant. Defendant acknowledges that the officers testified at the hearing on the motion to suppress that they were not allowed to write reports based on a policy of the police department that officers were not permitted to write reports if an officer discharged a firearm. However, defendant notes that defense counsel called this testimony into question by presenting a portion of the police department policy manual stating that an officer who discharges his or her weapon is to write a police report unless he or she is physically

unable.[2] Defendant further argues that, even if it was the policy of the police department to prohibit officers involved in a shooting from writing police reports, the policy itself would have called the credibility of the officers' testimony into question. Specifically, defendant contends that the jury could have inferred from the police department's policy that the department advised its officers to "keep quiet" in order to insulate the department from civil liability.

¶ 67        "The scope of a defendant's cross-examination is limited to the subject of direct examination and '[a]ny permissible matter which affects the witness's credibility.' " *Blue*, 205 Ill. 2d at 13 (quoting *Kliner*, 185 Ill. 2d at 130). "[T]he court enjoys discretion to impose reasonable limits on such cross-examination to assuage concerns about harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning ***." *Id.* However, "that discretion must be exercised in such a way as to allow the defendants wide latitude in establishing bias, motive or interest by a witness." *People v. Adams*, 129 Ill. App. 3d 202, 207-08 (1984). " 'Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion.' " *People v. Way*, 2017 IL 120023, ¶ 18 (quoting *People v. Harvey*, 211 Ill. 2d 368, 392 (2004)).

¶ 68        Here, the court abused its discretion in barring defense counsel from cross-examining Stapleton and Zettergren about their failure to write police reports. The officers' failure to write reports was relevant to their credibility as witnesses because it could support an inference that the officers sought to insulate themselves from potential scrutiny regarding their actions on the

---

[2]Defense counsel noted at the hearing on the motion *in limine* that the policy manual was ambiguous in that one portion of the manual stated that an officer who discharged a firearm was to write a report unless physically unable and another portion stated that the watch commander would designate a different officer to write the report. While these two portions of the manual may have created an ambiguity as to whether Stapleton was permitted to write a report, it does not appear that either portion of the manual would have prohibited Zettergren from writing a report.

day of the incident. Even if the officers had testified that department policy prevented them from writing police reports because Stapleton had discharged a firearm during the incident, the policy itself could have supported an inference that the officers' testimony lacked credibility. A blanket policy that officers who discharge firearms are precluded from writing police reports indicates a lack of transparency and deprives defendants of the valuable impeachment tool that police reports provide. See *People v. Williams*, 240 Ill. App. 3d 505, 506 (1992) (recognizing that police reports may be used for impeachment).

¶ 69    Stapleton's and Zettergren's testimony was important to the State's case against defendant. Accordingly, precluding defense counsel from challenging their credibility based on their failure to write police reports was prejudicial to defendant, especially when taken in conjunction with the trial court's ruling that defense counsel could not cross-examine Stapleton regarding the potential negative consequences to his employment if the shooting were determined to be unjustified. The tandem effect of these two rulings was to deprive defendant of a potential defense—namely, that the officers had motivation to testify falsely regarding their actions on the day of the incident to insulate themselves from the potential negative consequences if the shooting were determined to be unjustified. The defense should have been able to conduct the necessary cross-examination to present this theory to the jury.

¶ 70    Defendant concedes that he failed to preserve this issue for review by failing to include the issue in a posttrial motion. However, defendant requests that we review this issue under the first prong of the plain error doctrine on the basis that the evidence was closely balanced as to the offense of aggravated assault. See *McDonald*, 2016 IL 118882, ¶ 48 ("The plain error doctrine permits a reviewing court to consider unpreserved error when *** a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales

- 26 -

of justice against the defendant, regardless of the seriousness of the error ***."). Defendant does not contend that the evidence was closely balanced as to the charges of aggravated fleeing or attempting to elude a peace officer or DUI.

¶ 71　　We find that defendant's forfeiture of this issue is excused because the evidence was closely balanced as it related to the charge of aggravated assault. That is, the evidence was closely balanced as to whether defendant operated his vehicle in a manner that placed Stapleton in reasonable apprehension of being struck by the vehicle. The State's case for aggravated assault was based primarily on Stapleton's testimony that defendant accelerated his vehicle toward Stapleton, which caused him to fear for his life and discharge his firearm. However, Stapleton's testimony was contradicted by Kirk's testimony that defendant's vehicle remained stationary until after the shooting. Also, as we previously discussed, Stapleton's testimony that defendant accelerated his vehicle toward Stapleton prior to the shooting was not directly corroborated by other evidence at trial. See *supra* ¶ 62.

¶ 72　　　　　　　　　　　　　D. Prosecutorial Misconduct

¶ 73　　Defendant contends that the State engaged in prosecutorial misconduct during rebuttal closing argument. Specifically, defendant argues that the prosecutor "denigrated defense counsel, inflamed the passions of the jury, shifted the burden of proof, and urged the jury not to 'trick' themselves into thinking that there was any question as to whether or not [defendant] was guilty." Defendant concedes that he failed to preserve this issue for review by failing to include the issue in a posttrial motion and requests that we review the issue under the plain error doctrine.

¶ 74　　Because we have found that reversal of defendant's convictions for aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI is warranted on other

- 27 -

grounds, we do not reach this issue. We note, however, that some of the challenged remarks were improper. For example, the prosecutor's comment that defense counsel had a "fantasy" as to the law and the evidence improperly denigrated defense counsel. Also, the prosecutor's remark that there was "not one piece of evidence *** that exonerate[d]" defendant was improper. Defendant was not required to present any exonerating evidence; it was the State's burden to present sufficient evidence to prove defendant guilty beyond a reasonable doubt.

¶ 75    We caution the State on remand to avoid such improper commentary during closing argument in the event of a new trial. Rather, the State's argument should be limited to "comment[ing] on the evidence and all inferences reasonably yielded by the evidence." *People v. Blue*, 189 Ill. 2d 99, 127 (2000).

¶ 76                                    E. Presentence Monetary Credit

¶ 77    Defendant argues that, pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2012)), he is entitled to monetary custody credit for time spent in presentence custody in the amount of $1410 to be applied against the fine assessed by the court. The State concedes that defendant is entitled to such a credit. However, because we have reversed defendant's convictions, these assessments are no longer in effect. Accordingly, we do not address the merits of this issue.

¶ 78                                    III. CONCLUSION

¶ 79    For the foregoing reasons, we reverse defendant's convictions for aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI. We remand the matter for a new trial on these charges. Because defendant pled guilty to criminal damage to property prior to trial, the trial issues raised in this appeal do not affect that conviction.

¶ 80    Reversed and remanded.

¶ 81    JUSTICE WRIGHT, specially concurring:

¶ 82    For purposes of this offering, I will address the issues in the same order as they arose in the trial court. First, I agree with the author's reasoning and conclusion that the trial court should have denied the State's pretrial motion *in limine* and allowed defense counsel to conduct cross-examination of each officer about the absence of a police report. Second, I agree with the author's reasoning and conclusion that the trial court should have permitted defense counsel to cross-examine Stapleton on whether he could be testifying to a false version of the events, leading up to the shooting, in order to avoid negative consequences to his job. I also agree with the author that this error was not harmless. On these grounds, I agree with the author that defendant is entitled to a new trial.

¶ 83    I write separately because I believe the court's holding on these two issues alone, clearly requires a remand for a new trial. Therefore, I do not find it particularly helpful to express my views on the propriety of the prosecutor's closing arguments or to weigh in on the trial court's decision to allow interested parties to be present in the courtroom when the jurors were reviewing an exhibit, the videotape, during the course of their ongoing deliberations.

¶ 84    In conclusion, I agree defendant is entitled to a new trial based on the first two issues discussed in my separate decision set forth above.

¶ 85    PRESIDING JUSTICE SCHMIDT, dissenting:

¶ 86    I would find that none of the issues defendant raises in this appeal resulted in reversible error, and I would affirm defendant's convictions. Accordingly, I respectfully dissent.

¶ 87                                A. Jury Deliberations

¶ 88        Defendant waived his claim that the court erred in playing the video and audio recordings of the encounter in the courtroom in the presence of the parties during jury deliberations rather than in the jury room.

> "Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. [Citations.] In the course of representing their clients, trial attorneys may (1) make a tactical decision not to object to otherwise objectionable matters, which thereby waives appeal of such matters, or (2) fail to recognize the objectionable nature of the matter at issue, which results in procedural forfeiture." *Bowens*, 407 Ill. App. 3d at 1098.

¶ 89        Here, the record shows that defendant waived this issue by affirmatively agreeing to the procedure employed by the trial court. When the court said that everyone other than defendant, the attorneys, and court staff were to leave the courtroom while the video was played for the jury, defense counsel said "[f]air enough, [Y]our [H]onor." The court then asked if the parties had any issue before it brought in the jury, and defense counsel said "[n]othing from us." Because defendant agreed to the procedure employed by the trial court, he has waived any objection to the procedure on review.

¶ 90        As defendant waived this issue rather than forfeiting it, defendant is not entitled to review under the plain error doctrine. *Dunlap*, 2013 IL App (4th) 110892, ¶ 12 ("Plain-error analysis, of course, 'applies to cases involving procedural default ***, not affirmative acquiescence.' " (quoting *Bowens*, 407 Ill. App. 3d at 1101)). Even if not waived, the procedure did not constitute error, plain or otherwise.

¶ 91                        B. Limiting Cross-Examination of Stapleton

¶ 92 Defendant failed to preserve his claim that the court erred in barring defense counsel from cross-examining Stapleton about the consequences of an unjustified shooting and from arguing that Stapleton may have been motivated to lie about the incident in order to protect his job by failing to make an offer of proof. The court's limitation of defense counsel's cross-examination of Stapleton did not result in error. Even if I were to assume that error occurred, I would find any error to be harmless.

¶ 93 First, defense counsel failed to preserve this issue by failing to make an offer of proof as to what Stapleton's testimony would have been. "When a trial court refuses evidence, no appealable issue remains unless a formal offer of proof is made." *People v. Peeples*, 155 Ill. 2d 422, 457 (1993). "The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper." *People v. Andrews*, 146 Ill. 2d 413, 421 (1992). "Where it is not clear what a witness would say, or what his basis would be for saying it, the offer of proof must be considerably detailed and specific." *Peeples*, 155 Ill. 2d at 457. "However, an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced, or where the question itself and the circumstances surrounding it show the purpose and materiality of the evidence." *Id.* at 458. "The failure to make an adequate offer of proof results in a waiver of the issue on appeal." *Andrews*, 146 Ill. 2d at 421.

¶ 94 Here, defendant failed to make an offer of proof as to what Stapleton's testimony would have been had defense counsel been permitted to cross-examine him regarding the consequences of an unjustified shooting and his desire to protect his job. It is unclear what Stapleton would have said if defense counsel had questioned him regarding these matters. Accordingly, any

- 31 -

argument that Stapleton's testimony would have shown bias or motive to testify falsely is speculative and uncertain. Thus, defendant was required to make an offer of proof, and he has forfeited this issue by failing to do so. See *id.*

¶ 95    It seems clear that defendant's intended cross-examination was for the purpose of suggesting to the jury, simply by asking argumentative questions, that Stapleton fired his weapon at defendant without justification and he was lying in court to save his job. No one testified that Stapleton's discharge of his service weapon was unjustified. The issue was and is a red herring. If one could allow the type of examination requested by defendant, then the door is open to making unjustified allegations, simply through cross-examination, that every police officer is lying in court because he or she filed a false police report and now he or she must testify in accordance with that report to keep from being fired. This with no other evidence that the report was false or evidence in the record that indicates that counsel could close this "impeachment." What defense counsel suggests is a cross-examination that may go like this:

"Q. Officer, if you filed a false report, that would be the basis for your dismissal from the police force, correct?

A. If I did that, yes.

Q. And if you admitted here in court that your police report was intentionally false, that would pretty much seal your fate, wouldn't it?

A. Yes, I guess it would.

[DEFENSE COUNSEL]: Ah ha! So you're lying here in court to protect your job, isn't that right?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: No further questions for this witness." (As defense counsel bows to the jury.)

At that, defense counsel would have improperly suggested to the jury just by that cross-examination that the police officer was lying in court and his police report was false. That is not the way we do things. Defense counsel in this case was attempting the same tactic with respect to Stapleton's firing of his service weapon. The trial court did not err in disallowing this clearly improper tactic.

¶ 96    Even if I were to assume the court erred in limiting defense counsel's cross-examination of Stapleton, I would find any error to be harmless beyond a reasonable doubt upon application of the factors articulated in *Blue*, 205 Ill. 2d at 14. Whether Stapleton fired his weapon is irrelevant to any issue the jury was required to decide. It was and is a red herring. An officer may use deadly force to protect not only himself, but also others, including the public in general from the threat of imminent and serious harm. The prosecution's case for aggravated assault was strong. Stapleton testified that he ordered defendant to stop his vehicle several times, but defendant did not stop. Stapleton testified that defendant then accelerated his vehicle toward Stapleton, causing Stapleton to fear for his life. At that point, Stapleton discharged his firearm in an attempt to stop defendant's vehicle. However, whether he fired his weapon is irrelevant.

¶ 97    The audio and video recordings of the encounter generally corroborated Stapleton's testimony. In the audio recording, the officers repeatedly ordered defendant to stop the vehicle. The last time the officers ordered defendant to stop the vehicle was approximately one second before the gunshots could be heard. From this recording, an inference can be made that defendant had not stopped the vehicle at the time of the shooting. The video recording showed Stapleton running and the vehicle driving away as some of the gunshots were fired. Zettergren's

- 33 -

testimony that he saw and heard the vehicle accelerate prior to the shooting also partially corroborated Stapleton's testimony. While Kirk testified that defendant's vehicle did not begin moving until after Stapleton discharged his firearm, his testimony was inconsistent with the foregoing evidence.

¶ 98      Also, the cross-examination otherwise permitted by the court was extensive. Defense counsel was able to cross-examine Stapleton about his motivation for shooting defendant. When Stapleton testified that he was not trying to kill defendant but was only trying to make defendant stop his vehicle, defense counsel questioned Stapleton as to how shooting defendant would have caused the vehicle to stop. During closing argument, defense counsel argued that Stapleton's testimony was not credible and told the jury not to believe Stapleton if they thought he was "out of control" or "acting to protect his own interests."

¶ 99      C. Barring Defense Counsel From Questioning Officers About Failure to Write Police Reports

¶ 100      The trial court did not abuse its discretion in granting the State's motion *in limine* to bar defense counsel from questioning Stapleton and Zettergren about their failure to write police reports regarding their encounter with defendant. Stapleton and Zettergren had previously testified that the police department did not permit them to write reports in the event of an officer-involved shooting. Accordingly, the court granted the State's motion *in limine* on the basis that the officers' failure to write the reports did not show bias because the officers had no discretion as to whether they wrote reports. This ruling was within the court's discretion. See *id.* at 13 ("[T]he court enjoys discretion to impose reasonable limits on such cross-examination to assuage concerns about harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning ***.").

¶ 101     I disagree with the majority's finding that the police department's policy prohibiting officers from writing reports when an officer discharges a firearm would itself have called into question the credibility of Stapleton's and Zettergren's testimony. Even if the police department's general policy that officers involved in shootings were not to write police reports was rooted in a desire to protect the department from civil liability, such a policy does not support an inference that *in this particular case* the department feared civil liability or that the officers were testifying untruthfully. Such an inference would be remote and speculative. See *People v. Rivera*, 307 Ill. App. 3d 821, 833 (1999) ("To be admissible the evidence allegedly showing bias or motive must be positive and direct, not remote, speculative or uncertain.").

¶ 102     As the majority notes, defendant failed to preserve this issue and requests review under the first prong of the plain error doctrine. "Under the first prong [of plain error analysis], the defendant must show that the evidence was 'so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error.' " *People v. Johnson*, 238 Ill. 2d 478, 486 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Because I would find that the court did not err in granting the State's motion *in limine*, it would be unnecessary to consider whether the first prong of the plain error doctrine applies to this issue.

¶ 103     I disagree with the majority's finding that the evidence was closely balanced as to the charge of aggravated assault. Stapleton testified that he ordered defendant to stop his vehicle several times, but defendant did not stop. Instead, defendant accelerated his vehicle in Stapleton's direction, causing Stapleton to fear for his life. Stapleton then discharged his firearm in an attempt to stop defendant's vehicle. The audio recording of the encounter corroborated Stapleton's testimony that he repeatedly ordered defendant to stop the vehicle. The last time the

- 35 -

officers ordered defendant to stop the vehicle was approximately one second before the gunshots could be heard, which indicates that defendant had not yet stopped his vehicle at that time. The video recording showed Stapleton running and the vehicle driving away as some of the gunshots were fired. Zettergren's testimony that he saw and heard the vehicle accelerate prior to the shooting also partially corroborated Stapleton's testimony. McAbee testified that defendant drove his vehicle slowly and did not stop his vehicle when the officers commanded him to. McAbee was not watching defendant's vehicle as the gunshots were being fired. I acknowledge that Kirk testified that defendant's vehicle did not begin moving until after Stapleton discharged his firearm. However, Kirk's testimony was inconsistent with Stapleton's testimony, Zettergren's testimony, and the audio and video recordings.

¶ 104                 D. Prosecutorial Misconduct

¶ 105       Defendant argues that the State engaged in prosecutorial misconduct during rebuttal closing argument by making comments that denigrated defense counsel, inflamed the passions of the jury, shifted the burden of proof, and urged the jurors not to trick themselves into thinking that there was any question as to whether defendant was guilty.

¶ 106       I would find that the prosecutor erred in remarking that defense counsel had a "fantasy" about the law and the evidence. This comment improperly suggested that defense counsel fabricated a defense theory or attempted to free his client through trickery or deception. See *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000). I would find that the other challenged remarks, when viewed in context, did not result in error.

¶ 107       Defendant concedes that he failed to preserve this issue for appeal and requests review under both prongs of the plain error doctrine. See *McDonald*, 2016 IL 118882, ¶ 48. I would find that the prosecutor's single improper comment did not warrant reversal under either prong.

Contrary to defendant's argument, the evidence regarding the offense of aggravated assault was not closely balanced. See *supra* ¶ 100. Also, defendant is not entitled to relief under the second prong of the plain error doctrine because the lone improper comment was not "so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565.

¶ 108                                      E. Presentence Monetary Credit

¶ 109        Regarding defendant's claim that he was entitled to $1410 in presentence monetary credit to be applied against his fines pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2012)), I would accept the State's confession of error and award the credit.

**No. 3-15-0880**

| | |
|---|---|
| **Cite as:** | People v. Pacheco, 2019 IL App (3d) 150880 |
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 12-CF-1799; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Emily A. Koza, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |