**2023 IL 127535**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

───────────────

(Docket No. 127535)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
JAMES A. PACHECO, Appellee.

*Opinion filed October 19, 2023.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville and Overstreet concurred in the judgment and opinion.

Justice Rochford specially concurred, with opinion, joined by Justices Holder White and O'Brien.

**OPINION**

¶ 1      The defendant, James Pacheco, was found guilty of aggravated assault and other offenses after he tried to hit a Joliet police officer with his car. During the incident, the police officer shot and injured Pacheco. On appeal, the appellate court reversed

Pacheco's convictions finding that (1) the trial court violated Pacheco's right to confrontation by prohibiting defense counsel from cross-examining the police officer who shot Pacheco as to whether the officer believed he could lose his job if the shooting was found to be unjustified and (2) the trial court erred in granting the State's motion *in limine* to bar defense counsel from asking the officer and his partner why they did not write police reports regarding the incident. 2021 IL App (3d) 150880-B. For the following reasons, we reverse the judgment of the appellate court and remand the cause to that court for further proceedings.

¶ 2                                    BACKGROUND

¶ 3        The State charged Pacheco with aggravated assault (720 ILCS 5/12-2(b)(4)(i), (c)(8) (West 2012)), attempted aggravated battery (*id.* § 12-3.05(d)(4)(i)), aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(4) (West 2012)), criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2012)), and two counts of driving under the influence (DUI) (625 ILCS 5/11-501(a)(1), (2) (West 2012)). All the charges related to an incident that began in the early morning hours of July 30, 2012. On that date, at approximately 2:20 a.m., Joliet police officer Adam Stapleton and his partner, Eric Zettergren, responded to a call that Pacheco had broken the windows of a pickup truck and driven off in his car. When the officers arrived at the scene, Pacheco led them on a high-speed car chase through Joliet, eventually stopping when a train blocked his path. The officers got out of their squad car to make an arrest, but Pacheco drove his car toward Stapleton. Stapleton then fired several shots through Pacheco's windshield, striking Pacheco. Although injured, Pacheco drove away. He was subsequently arrested after he lost control of his car and crashed into a stoplight pole.

¶ 4        Prior to trial, the State filed two motions *in limine*. In the first motion, the State sought to bar defense counsel from eliciting any testimony regarding the absence of police reports written by Stapleton and Zettergren about the pursuit and arrest of Pacheco. A hearing was held on the motion, during which the State noted that both Stapleton and Zettergren had testified at an earlier suppression hearing that, because Stapleton had discharged his firearm, both he and Zettergren were prohibited from preparing any police reports about Pacheco's arrest. The State further noted that the officers had stated they believed the prohibition was imposed by the Joliet Police

Department for legal reasons and that, instead of preparing a police report, they were required to provide a separate, video recorded statement about the incident. The State argued that, in light of these facts, any testimony that the officers failed to prepare police reports would not show any bias or incompetence on their part and, therefore, should be barred.

¶ 5     The Will County circuit court granted the State's motion *in limine*. Relying on the police officers' testimony, the court found they had no discretion to prepare police reports and, therefore, the "absence of a report [was] not a bad act." Given this fact, the court concluded that the proposed line of questioning was irrelevant because it had nothing to do with establishing the bias of the officers. The court noted that it would reconsider its ruling if defense counsel could provide contrary testimony that the officers did possess discretion to write police reports. Defense counsel, however, did not make any further representations to the court on the matter and did not provide any additional evidence.

¶ 6     The State's second motion *in limine* concerned an interoffice memo prepared by the Joliet Police Department's deadly force review panel. In this memo, the panel reviewed Stapleton's discharge of his weapon and found it to be a justified use of force. In a separate section of the memo, the panel made certain policy recommendations regarding police officers' use of force.

¶ 7     In its motion *in limine*, the State asked the trial court to prohibit defense counsel from making reference to any portion of the review panel's memo that discussed the policy recommendations. The State maintained these policy recommendations were unrelated to the actions taken by Stapleton or Zettergren and were irrelevant to the crimes with which Pacheco was charged. During a hearing on the motion, defense counsel argued that the policy recommendations were, in fact, relevant and that he should be able to cross-examine Stapleton as to whether he knew that, as a result of what happened with Pacheco, certain changes had been suggested to the police department's policy on the use of deadly force.

¶ 8     Addressing the motion, the trial court first noted the review panel's finding that the use of "deadly force in this incident was justified." The court then observed that it would "never" allow the State to present evidence that a "panel of people who weren't there" determined that Stapleton's discharge of his weapon "was a justified shooting. Never." The court similarly concluded that defense counsel could not

present evidence of any policy recommendations because such recommendations simply were "not relevant" to the criminal charges at issue. The trial court then stated that it was granting the motion *in limine* as "to both the State and defense." That is, defense counsel was prohibited from introducing any policy recommendations noted by the review panel, and the State was expressly "prohibited from bringing any findings that what the officers did on scene was all justified."

¶ 9        Prior to trial, Pacheco pleaded guilty to criminal damage to property. The matter then proceeded to a jury trial on the remaining charges.

¶ 10       At trial, Ralph Gallup, his son, Jonathan Gallup, and their neighbor, Reginald Phillips, testified that they heard glass breaking at approximately 2:20 a.m. on July 30, 2012. Investigating the sound, they saw a black car, being driven by Pacheco, in the alley behind their homes. Jonathan saw that the windows of Ralph's pickup truck were broken, and he or Ralph then called the police.

¶ 11       Stapleton testified that he and Zettergren responded to the call. According to Stapleton, while driving to the scene of the complaint, they encountered a black Nissan, driven by Pacheco, facing north on Union Street at the intersection with Washington Street. Pacheco had his left turn signal on to go west on Washington but instead turned right. Stapleton activated his lights, and Pacheco then turned south on a side street, pulling over halfway down the block. The officers exited their squad car, but Pacheco sped off. After they returned to the squad car, the officers began pursuing Pacheco.

¶ 12       Stapleton stated that he activated his siren and used the squad car's public address system to tell Pacheco numerous times to stop his vehicle because he was going to get hurt or hurt someone else. Pacheco did not comply. Pacheco then turned right on Washington Street, heading east, without stopping at the stop sign. Pacheco took off at a high rate of speed, well over the speed limit, and went through another stop sign. Shortly thereafter, according to Stapleton, Pacheco lost control of his car, sliding up onto the parkway and then getting back on Washington, heading east.

¶ 13       Stapleton testified that Pacheco eventually stopped his car near a company called the Filtration Group because a train was blocking the street. Pacheco then

turned his car to the left facing north in the westbound lane of Washington Street. Stapleton stated that he pulled the squad car parallel with Pacheco's. Believing Pacheco had given up, Stapleton then exited the squad car and went around to the rear of the car to get a better look at Pacheco. Zettergren also exited the squad car. Stapleton stated that he told Pacheco to stop his car. Pacheco then said, "what the f*** did you pull me over for" and that he "didn't do anything."

¶ 14 Stapleton testified that Pacheco began backing up his vehicle, attempting to head west on Washington Street by making a left turn. Stapleton repeatedly told Pacheco to stop his car. Pacheco's car stopped and then started to roll forward as if Pacheco had taken his foot off the brake. Stapleton stated he was in the roadway attempting to block Pacheco's escape as the car came toward him. Stapleton said he continued to order Pacheco to stop the car but that Pacheco instead accelerated toward him and the rear of the squad car.

¶ 15 Stapleton testified that when Pacheco's car did not stop, he was afraid he was going to be killed. Believing Pacheco would run him over, Stapleton discharged his firearm in the direction of Pacheco. Stapleton stated he knew he was standing in front of Pacheco's vehicle when he fired his weapon.

¶ 16 Stapleton testified that Pacheco then headed west on Washington Street, driving past him at a high rate of speed. Stapleton stated that Pacheco drove close enough to him that he could feel the wind from the car as it drove by. Stapleton then turned around and headed back to his squad car.

¶ 17 Stapleton testified that he and Zettergren reentered the squad car and pursued Pacheco west on Washington Street. Additional squad cars then joined in the pursuit. Pacheco ran through stoplights and stop signs and continued to drive through residential streets at a high rate of speed. Eventually, according to Stapleton, Pacheco lost control of his car and struck a stoplight pole. Several officers then told Pacheco to get out of the car and tried to remove him, but he resisted. Stapleton stated that another officer asked if anyone had a Taser. Stapleton had one, and he deployed it against Pacheco. Pacheco then got out of his car, was arrested, and was given medical treatment. Stapleton testified that it was never his intention to hurt Pacheco and he only wanted to stop him from hurting anybody else.

¶ 18    The State introduced an audio recording captured by surveillance equipment at the Filtration Group into evidence. The recording, which was played for the jury, is largely consistent with Stapleton's testimony. On the recording, after sirens are heard, a voice can be heard yelling, "I didn't do anything." Another voice repeats "stop the car" several times. Seven gunshots can then be heard. The gunshots begin approximately one second after the voice says "stop the car" for the last time. After that, a vehicle can be heard accelerating. Then, sirens and the sound of another vehicle accelerating can be heard.

¶ 19    The State also introduced a video recording of the encounter into evidence, which was also captured by surveillance equipment at the Filtration Group. The video recording, which is largely consistent with Stapleton's testimony, was also played for the jury. In the video recording, a dark-colored car can be seen driving past a parked semitruck. A squad car with its sirens and lights activated follows closely behind. The two vehicles drive off the screen, and voices can be heard. Seven gunshots can then be heard in rapid succession. Shortly after the last shot, the dark-colored car drives back into the screen. A person appears close to the car and then can be seen running away. The car drives away, and approximately 15 to 20 seconds later, the squad car follows. Stapleton testified at trial that he was the person running in the video.

¶ 20    On further direct examination, Stapleton repeated that he was standing in front of Pacheco's car the entire time he discharged his firearm. He also stated that once he fired his weapon, he had enough time to get out of the car's path.

¶ 21    Defense counsel cross-examined Stapleton at length, attempting to undermine Stapleton's credibility regarding the shooting and whether he was in reasonable apprehension of being struck by Pacheco's car. Counsel tested Stapleton's memory of events, including the location and movement of Pacheco's car and how many shots Stapleton fired. He also repeatedly questioned Stapleton regarding his location and position during the shooting, suggesting that Stapleton was not in front of Pacheco's car and was not in fear of being struck but was, instead, firing at Pacheco as he drove by. Stapleton continued to maintain, however, that Pacheco accelerated toward him and that he fired his weapon to stop Pacheco from running him over.

¶ 22        During defense counsel's cross-examination, the parties had a discussion with the trial court outside the presence of the jury. Defense counsel stated that he planned to ask Stapleton whether he was afraid he would lose his job if it was determined that he improperly used deadly force when he shot at Pacheco. Counsel explained that whether Pacheco was guilty of aggravated assault turned on whether Stapleton was in the path of Pacheco's car and was in reasonable apprehension of being hit. According to counsel, whether Stapleton believed he could face negative employment consequences from an unjustified shooting would tend to show a motive for testifying falsely. Specifically, it would tend to show that Stapleton was lying about Pacheco trying to hit him so that he would not lose his job.

¶ 23        The State, in response, argued it would be improper for defense counsel to argue that Stapleton had "a motive to testify falsely out of a desire or motivation to protect his job." The trial court agreed with the State and prohibited the proposed question. The court reasoned that, pursuant to the holding in *People v. Adams*, 2012 IL 111168, "[y]ou cannot tie perjury or sworn testimony to employment in a criminal case."

¶ 24        Zettergren offered testimony that was largely consistent with Stapleton's. Zettergren stated that he and Stapleton pursued Pacheco's vehicle until it stopped where the train was blocking the road. Zettergren then exited the squad car from the front passenger side of the car. At that point, Pacheco began backing up his car, and Zettergren and Stapleton yelled at Pacheco to stop. According to Zettergren, Pacheco continued to back up and pointed his car at the two of them. Zettergren told Pacheco to stop, but the car began rolling toward him. Pacheco then turned the wheel to the left, and the car started to turn away from him, toward the rear of the squad car and in the direction of Stapleton.

¶ 25        Zettergren testified that Stapleton ordered Pacheco to stop. Pacheco did not comply but, instead, accelerated his car. Zettergren heard Stapleton give more commands and then heard shots being fired. According to Zettergren, he could not see Stapleton at that point. Zettergren stated he then saw Pacheco's vehicle drive away at a high speed. He and Stapleton returned to their squad car and pursued Pacheco until he crashed.

¶ 26    On cross-examination, Zettergren confirmed that he did not see Stapleton at the time he fired his weapon, nor did he know Stapleton's situation. Zettergren explained that this was because he was fixated on Pacheco and his car.

¶ 27    Michael McAbee, a semitruck driver, testified that he and his adult son, Jamie Kirk, were sleeping on bunks in McAbee's semitruck in the early morning hours on the date of the incident. They were parked at the Filtration Group waiting for the plant to open to drop off their freight. McAbee stated that, at approximately 2:45 a.m., he heard sirens, which woke him up. He then saw a black car drive up to the train tracks where a train was parked. A squad car then passed with its lights on and stopped. When the black car turned around, the squad car pulled up at an angle to it, and two police officers exited the squad car. According to McAbee, the officers yelled at the driver of the black car several times, telling him to stop his car.

¶ 28    McAbee testified that the black car backed up and then started driving back in the direction from which it had come. The officers were still yelling at the driver of the black car, telling him to "stop the f'ing car or they gonna shoot." At one point, the driver of the black car yelled at the officer to get out of his way but did not otherwise respond. McAbee stated that one officer drew his gun and yelled at the driver to stop the vehicle. McAbee could see the officer "a little bit" at that point. The black car did not stop. Rather, "he acted as an old person; drove easy." McAbee testified that he heard five gunshots, covered his face, and took cover. When he looked up again, both vehicles were gone.

¶ 29    Kirk testified that he was 19 years old. In the early morning hours on the date of the incident, he heard McAbee exclaim, and he woke up. Kirk stated that he saw one police officer standing by the squad car on the driver's side near the trunk but did not see a second officer. The officer near the trunk told the man driving the black car "to stop the car or he'd effing shoot." The officer was holding a gun pointed at the black car. Kirk stated that he heard the person in the black car "say to the cop to get the—out of his way, F-word." According to Kirk, and contrary to the testimony of the other eyewitnesses, the black car remained stationary and did not move until after the officer fired his gun. Kirk acknowledged that it was possible the black car was moving so slowly that he could not tell it was moving. Kirk believed the officer fired six shots.

- 8 -

¶ 30    A firefighter paramedic testified that he responded to the scene where Pacheco had crashed into the stoplight pole and that he transported Pacheco to the hospital in an ambulance. A phlebotomist testified she drew Pacheco's blood when he was at the hospital. The phlebotomist stated that she took the blood to the hospital's laboratory for testing and the test showed Pacheco's blood alcohol content was 0.183.

¶ 31    Police officer Chris Delaney testified that he was a crime scene technician and that he photographed Pacheco's car after the incident. Delaney stated that the photographs showed there were six bullet holes in Pacheco's windshield and one bullet hole on the hood of the vehicle. According to Delaney, there was no bullet damage to either the passenger or driver's side of the car.

¶ 32    After the State rested, defense counsel moved for a directed verdict. The motion was denied. Defense counsel then asked the trial court to revisit its ruling on the issue of whether he could ask Stapleton if he believed the shooting could have a potential negative impact on his employment. The State responded there was no evidence of improper discharge and reminded the court that, in fact, the deadly force review panel of the Joliet Police Department had found Stapleton's conduct proper. Following argument, the trial court reaffirmed its previous ruling that it would not allow defense counsel's question.

¶ 33    Defense counsel called several police officers to testify about Pacheco's pursuit and arrest. Sergeant Thomas Grutzius examined data from Stapleton's Taser, which showed it had been fired twice. A camera connected to the Taser recorded a portion of Pacheco's arrest, and that video was played for the jury.

¶ 34    During closing argument, defense counsel asserted that Stapleton's testimony was not credible and that the evidence did not establish that Pacheco attempted to hit Stapleton. Counsel stated:

> "Ladies and gentlemen, I think the whole case boils down to credibility, credibility and an understanding of human nature. If you believe that Officer Stapleton was out of control that day, do not believe him. If you believe the officers are not consistent with each other, do not find [defendant] guilty. If you think Officer Stapleton was purposely abuseful, don't believe a word out of his mouth. If you think he was exaggerating here in [c]ourt, be offended, and then

don't believe him. If you think he was acting to protect his own interests, don't believe him. If you think he lied when he said all the shots came from the front, don't believe him.

And, ladies and gentlemen, if you don't believe him, if you don't believe the officers, some of the officers in this case, there is not proof beyond a reasonable doubt."

¶ 35 During jury deliberations, the jury asked to have the video and audio recordings replayed. After discussion, the recordings were replayed for the jury in the courtroom with everyone removed except the parties and court staff. Subsequently, the jury found Pacheco guilty of aggravated assault, aggravated fleeing or attempting to elude a peace officer, and DUI. The jury found Pacheco not guilty of attempted aggravated battery.

¶ 36 After denying Pacheco's motion for a new trial, the court sentenced him to four years' imprisonment for aggravated assault and three years' imprisonment for aggravated fleeing or attempting to elude a peace officer, to be served concurrently. The court entered "straight judgments of conviction" for criminal damage to property and DUI and found the sentences for those offenses merged with the sentences for aggravated assault and aggravated fleeing or attempting to elude a peace officer.

¶ 37 Pacheco appealed, contending (1) the trial court erred in replaying the video and audio recordings for the jury in the courtroom rather than in the jury room, (2) the trial court violated his right to confrontation by limiting cross-examination of Stapleton, (3) the trial court abused its discretion in granting the State's motion *in limine* regarding Stapleton and Zettergren's failure to write a police report, (4) the State engaged in prosecutorial misconduct during closing argument, and (5) Pacheco was entitled to monetary credit for time spent in presentence custody.

¶ 38 Over a dissent, the appellate court reversed and remanded, agreeing with the first three of Pacheco's arguments and not reaching the fourth and fifth. *People v. Pacheco*, 2019 IL App (3d) 150880. This court subsequently vacated the judgment of the appellate court and directed it to reconsider its decision in light of *People v. Hollahan*, 2020 IL 125091, on the issue of whether the trial court erred in playing

the recordings in court. *People v. Pacheco*, No. 125191 (Ill. Nov. 18, 2020) (supervisory order).

¶ 39    With one justice dissenting, the appellate court again reversed and remanded. 2021 IL App (3d) 150880-B. The appellate court first found the trial court committed no error when it replayed the recordings for the jury in the courtroom, rather than the jury room. *Id.* ¶ 46. The court then addressed Pacheco's contention that the trial court violated his right to confrontation by barring his cross-examination of Stapleton as to whether he was afraid he would lose his job if the shooting was found to be unjustified. *Id.* ¶ 56. The appellate court concluded this was a proper subject of cross-examination because it went to Stapleton's potential bias or motive to testify falsely. *Id.* For this reason, according to the appellate court, Pacheco's right to confrontation had been violated. *Id.* The appellate court then found *Adams*, which the trial court had referenced, distinguishable and concluded that the confrontation clause violation was not harmless. *Id.* ¶¶ 57-63.

¶ 40    The appellate court next concluded that the trial court abused its discretion and committed plain error when it granted the State's motion *in limine* barring defense counsel from questioning Stapleton and Zettergren about their failure to write police reports. *Id.* ¶¶ 65-67. According to the appellate court, the failure to write reports was relevant to the officers' credibility since it could support an inference that they sought to insulate themselves from potential scrutiny regarding their actions that day. *Id.* ¶ 67.

¶ 41    The appellate court again did not reach Pacheco's arguments that the State engaged in prosecutorial misconduct during closing argument and that he was entitled to monetary credit for time spent in presentence custody. This appeal followed. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 42                                   ANALYSIS

¶ 43    The State challenges the appellate court's rulings that the trial court violated Pacheco's right to confrontation by limiting the cross-examination of Stapleton and that the trial court erred in granting the State's motion *in limine* regarding the police reports. We address each issue in turn.

¶ 44 Cross-Examination of Officer Stapleton

¶ 45 The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *People v. Klepper*, 234 Ill. 2d 337, 355 (2009). This includes the right to cross-examine the witness for the purpose of showing bias, interest, or motive to testify falsely. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-17.

> "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which . . . could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Davis*, 415 U.S. at 318).

¶ 46 Relying on this principle, the appellate court in this case determined that Pacheco's right to confrontation was violated. 2021 IL App (3d) 150880-B, ¶¶ 55, 61. The appellate court noted that defense counsel's proposed question went to Stapleton's motive to testify falsely about whether Pacheco accelerated toward him. *Id.* ¶ 56. Because this question was not allowed, the appellate court reasoned, there was a constitutional violation. *Id.* ¶ 63. In other words, according to the appellate court, the fact that the trial court prohibited a question that went to Stapleton's motive to lie was, standing alone, sufficient to violate Pacheco's right to confrontation. This was error by the appellate court.

¶ 47 A trial court may impose limitations on a defense counsel's cross-examination into the potential bias of a prosecution witness without offending the defendant's sixth amendment right to confrontation. *Van Arsdall*, 475 U.S. at 679; *Klepper*, 234 Ill. 2d at 355. The trial court possesses wide latitude to impose reasonable limitations on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or of little relevance (*Van Arsdall*, 475 U.S. at 679), and it may impose certain restrictions on cross-examination so long as those restrictions serve " 'legitimate

interests in the criminal trial process' [citation] and are not 'arbitrary or disproportionate to the purposes they are designed to serve.' " *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987)). As the United States Supreme Court has observed, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); see also, *e.g.*, *United States v. Whyte*, 928 F.3d 1317, 1334-35 (11th Cir. 2019) (" 'the mere fact that [the defendant] sought to explore bias on the part of a prosecution witness does not automatically void the court's ability to limit cross-examination' " (quoting *United States v. Diaz*, 26 F.3d 1533, 1540 (11th Cir. 1994))).

¶ 48   Accordingly, when reviewing a confrontation clause challenge, we do not "isolate the particular limitation on cross-examination to determine whether reversible error has occurred." *People v. Harris*, 123 Ill. 2d 113, 145 (1988). Instead, we look to the record as a whole (*id.*), including the necessity for the limitation and the alternative means open to the defendant to impeach the witness. "[I]f a review of the entire record reveals that the [fact-finder] has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *Id.* Ultimately, the question in each case must be " 'whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony.' " *Id.* (quoting *United States v. Rogers*, 475 F.2d 821, 827 (7th Cir. 1973)). Whether cross-examination has satisfied constitutional scrutiny is a question of law we review *de novo*. *People v. Williams*, 238 Ill. 2d 125, 141 (2010).

¶ 49   In this case, defense counsel wanted to ask Stapleton whether he feared that he would lose his job if the shooting was found to be unjustified. Had counsel asked the question, Stapleton's answer would certainly have been, "no." The Joliet Police Department's deadly force review panel had determined that Stapleton's conduct was appropriate. Stapleton thus could not have been in fear that his testimony would have negative consequences for his job.

¶ 50    Importantly, however, that would not have ended the matter. Having asked the question, the door would then have been opened for the State to address the issue of employment consequences, thereby allowing the State to introduce the finding of the review panel that the shooting was justified. See, *e.g.*, *People v. Manning*, 182 Ill. 2d 193, 216 (1998) ("in a criminal case, where the door to a particular subject is opened by defense counsel on cross-examination, the State may, on redirect, question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination"). This is the result the trial court expressly stated should "never" happen, since it would be wholly improper for the jury to hear that a "panel of people who weren't there" determined that Stapleton's discharge of his weapon "was a justified shooting" and, by implication, that he was in reasonable apprehension of being struck by Pacheco's car. In short, the limitation the trial court imposed on the cross-examination of Stapleton was necessary to avoid a highly prejudicial outcome to Pacheco. Given these circumstances, we cannot say that the trial court erred.

¶ 51    Further, defense counsel was not otherwise limited in his cross-examination of Stapleton. Counsel repeatedly tested Stapleton's memory of events, including his location and position during the shooting and how many shots he fired. He also challenged the reasonableness of firing his weapon and whether he harbored any animus toward Pacheco. Finally, in closing argument, counsel repeatedly asserted that Stapleton's testimony should not be believed, that he was "out of control," and that "he was acting to protect his own interests." Although counsel did not identify what those interests were, the jury would certainly have been aware that they included his employment. Indeed, defense counsel himself, when arguing to the trial court that he should be allowed to ask his proposed question, noted that "[i]t is pretty obvious to everybody if you do not do your job properly as a police officer, there can be consequences. This is simple common sense." The jury in this case was made amply aware of facts that bore upon the reliability and credibility of Stapleton's testimony and the propriety of his conduct on the day of Pacheco's pursuit and arrest. The jury simply chose to accept Stapleton's version of events over Pacheco's.

¶ 52    Having reviewed the record as a whole, we conclude that the trial court did not violate Pacheco's right to confrontation when it denied defense counsel's request

- 14 -

to inquire of Stapleton as to whether he believed he could lose his job if the shooting was found to be unjustified. For similar reasons, we also find that the trial court did not abuse its discretion when it prohibited the question. See *People v. Blue*, 205 Ill. 2d 1, 13-14 (2001).

¶ 53                          Motion *In Limine* Regarding Police Reports

¶ 54    The State contends the trial court properly granted its motion *in limine* to bar defense counsel from asking Stapleton and Zettergren about their failure to write police reports and that the appellate court erred in reversing the trial court on this issue. Motions *in limine* are encouraged in criminal cases to exclude collateral or extraneous matters. *City of Naperville v. Watson*, 175 Ill. 2d 399, 409 (1997). A motion *in limine* is addressed to the trial court's inherent power to admit or exclude evidence, and a reviewing court will not reverse the trial court's decision to grant or deny a motion *in limine* absent a clear abuse of discretion. *People v. Williams*, 188 Ill. 2d 365, 369 (1999). The trial court abuses its discretion when "its decision is 'fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. Kladis*, 2011 IL 110920, ¶ 23 (citing *People v. Ortega*, 209 Ill. 2d 354, 359 (2004)). A trial court properly exercises its discretion to preclude repetitive or unduly harassing testimony or to exclude evidence of bias that is too remote or uncertain. *People v. Frieberg*, 147 Ill. 2d 326, 357 (1992). A trial court also properly exercises its discretion to preclude nonrelevant evidence that would confuse or mislead the jury. *People v. Prevo*, 302 Ill. App. 3d 1038, 1048 (1999).

¶ 55    Here, Pacheco concedes he forfeited any challenge on this question but requests review under the first prong of the plain error doctrine. The plain error doctrine allows a reviewing court to address a forfeited claim where a clear or obvious error occurred and (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error' " or (2) the " 'error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Galarza*, 2023 IL 127678, ¶ 45 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The defendant carries the burden of persuasion under either prong of the plain error doctrine.

*People v. Lewis*, 234 Ill. 2d 32, 43 (2009). The first step in our analysis is determining whether a clear and obvious error occurred. *People v. Hutt*, 2023 IL 128170, ¶ 29.

¶ 56    The trial court granted the State's motion *in limine* on the basis of Stapleton's and Zettergren's testimony that they were prohibited by the Joliet Police Department from preparing police reports because a weapon had been discharged during the pursuit and arrest of Pacheco. The court reasoned that, absent any discretion on their part, Stapleton's and Zettergren's failure to write reports could not be considered bad acts and, therefore, could not suggest any bias or incompetence.

¶ 57    Rejecting this reasoning, the appellate court below stated that defense counsel called Stapleton's and Zettergren's testimony "into question by presenting a portion of the police department policy manual stating that an officer who discharges his or her weapon is to write a police report unless he or she is physically unable" (2021 IL App (3d) 150880-B, ¶ 65) and that nothing in "the manual would have prohibited Zettergren from writing a report" (*id.* ¶ 65 n.2). This is incorrect. As Pacheco acknowledges before this court, defense counsel did not present a policy manual to the trial court but, instead, only referenced the interoffice memo prepared by the deadly force review panel that discussed proposed policy changes. And, as was noted at the time the memo was discussed in court, there was no evidence that any of those proposals were in effect at the time of Pacheco's offenses or if they had ever been adopted at all. Stapleton's and Zettergren's testimony that they were prohibited from writing police reports was uncontradicted. The trial court did not abuse its discretion in relying on that testimony when ruling on the motion *in limine*.

¶ 58    The appellate court also found that, even if it was true that the officers were prohibited from preparing police reports, the trial court should nevertheless have permitted cross-examination on this issue because such a practice "indicates a lack of transparency" on the part of the Joliet Police Department and deprived Pacheco of the "valuable impeachment tool that police reports provide." *Id.* ¶ 67. We disagree.

¶ 59    Whether the Joliet Police Department's practice of having another officer prepare the police report when a weapon has been discharged indicated a "lack of

transparency" on the part of the Department was not relevant to the criminal charges before the jury. The "credibility" of the Department or the wisdom of its practices was not at issue. The credibility of the individual officers was what mattered. Because the individual officers had no choice in the matter, their failure to write police reports was irrelevant to any question of bias or credibility. Further, any inquiry into police department policies and practices would necessarily have resulted in a "minitrial" on the issue, requiring the testimony of officials from the Joliet Police Department to explain how those practices worked and why they were in place. None of this would have been relevant to the individual credibility of Stapleton's or Zettergren's testimony and would have distracted the jury from the question of determining the guilt or innocence of Pacheco.

¶ 60    Finally, Stapleton and Zettergren were required to and did, in fact, give video recorded statements regarding the incident. The trial court specifically advised defense counsel that these recordings were available for his use at trial for impeachment purposes. Counsel did not use them. Contrary to the appellate court's conclusion, Pacheco was not denied a valuable impeachment tool.

¶ 61    The trial court's granting of the State's motion *in limine* was not " 'fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it.' " *Kladis*, 2011 IL 110920, ¶ 23 (quoting *Ortega*, 209 Ill. 2d at 359). Accordingly, the trial court did not abuse its discretion in granting the State's motion *in limine*. Because the trial court did not commit a clear or obvious error, there was no plain error.

¶ 62                                    CONCLUSION

¶ 63    For the foregoing reasons, the judgment of the appellate court is reversed. This cause is remanded to the appellate court to address Pacheco's claim of prosecutorial misconduct during closing argument and presentence monetary credit.

¶ 64    Appellate court judgment reversed.

¶ 65    Cause remanded.

¶ 66 JUSTICE ROCHFORD, specially concurring:

¶ 67 I agree with my colleagues that the appellate court's judgment should be reversed. However, I disagree with the majority's confrontation clause analysis. I would hold that the trial court erred in foreclosing all inquiry into whether Officer Stapleton had a motive to lie. However, I would hold the error harmless beyond a reasonable doubt.

¶ 68 The majority states most of the governing principles correctly. As the United States Supreme Court held in *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)),

"a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' "

A "defendant has the right to inquire into a witness' bias, interest, or motive to testify falsely." *People v. Coleman*, 206 Ill. 2d 261, 278 (2002); see also *People v. Triplett*, 108 Ill. 2d 463, 475 (1985) ("cross-examination to show bias, interest, or motive to testify falsely is a matter of right"). "[T]he court should afford a defendant the widest latitude to establish the witness' bias or hostile motivation." *People v. Blue*, 205 Ill. 2d 1, 14 (2001). Although exposing a witness's motivation in testifying is an "important function of the constitutionally protected right of cross-examination" (*Davis*, 415 U.S. at 316-17), it does not follow that a trial judge may not place any limits on defense counsel's exploration of bias on the part of a prosecution witness (*Van Arsdall*, 475 U.S. at 679). Trial courts retain wide latitude under the confrontation clause to place reasonable limits on cross-examination, "based on concerns about *** harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* The confrontation clause guarantees the accused "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*). This court recognized these same principles in *Blue*, 205 Ill. 2d at 13, where we noted that the trial court's discretion to place reasonable limits on cross-examination arises "only after the court has

- 18 -

permitted sufficient cross-examination to satisfy the confrontation clause." See also *People v. Frieberg*, 147 Ill. 2d 326, 357 (1992) (circuit court has no discretionary power to deny the defendant the right to cross-examine a witness as to biases, interests, or motives to testify but retains discretion to preclude repetitive or unduly harassing questions on these matters).

¶ 69 Thus, when a defendant is alleging that his confrontation rights were violated by a trial court's denial of the opportunity to explore a prototypical form of bias on the part of a witness, the first inquiry is whether the trial court foreclosed the area of inquiry entirely. In *Van Arsdall*, the Supreme Court held that the trial court had erred in prohibiting all inquiry into the possibility that a prosecution witness may have been biased because of the dismissal of his pending criminal charge. "By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." *Van Arsdall*, 475 U.S. at 679. In *Blue*, this court held that the trial court had erred in barring all inquiry into the gang affiliation of prosecution witnesses. *Blue*, 205 Ill. 2d at 18. Doing so "unreasonably limited the defense from exploring these witnesses' biases." *Id.* This court also cautioned that trial courts should hesitate to grant motions *in limine* when " 'the result will be, for all practical purposes, an evisceration of the defendant's theory of the case.' " *Id.* at 22 (quoting *People v. Prevo*, 302 Ill. App. 3d 1038, 1050 (1999)).

¶ 70 Here, the appellate court applied these same principles in determining that the trial court erred by foreclosing all inquiry into whether Officer Stapleton had a motive to lie. Defendant's theory of the case was that Officer Stapleton was lying about the incident because he feared the employment consequences of engaging in an unjustified shooting. Relying on *Van Arsdall*, the appellate court held that the trial court had erred in foreclosing this area of inquiry:

"This was a proper subject of cross-examination, as it went to Stapleton's potential bias or motive to testify falsely. By barring defense counsel from pursuing this line of questioning, the court improperly prevented defendant from ' "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." ' " 2021 IL App (3d)

150880-B, ¶ 56 (quoting *Blue*, 205 Ill. 2d at 14, quoting *Van Arsdall*, 475 U.S. at 680).

The court also noted that, although defense counsel was able to challenge Officer Stapleton's credibility based on inconsistencies between his testimony and other evidence, defense counsel was *not* able to explore any *motivation* Officer Stapleton might have had to testify falsely. By contrast, the State was allowed to present argument that Officer Stapleton's only motivation was "to do his job and keep the community safe." *Id.* ¶ 62.

¶ 71        The majority rejects the appellate court's confrontation clause analysis, contending that the proper analysis is found in an older case of ours, *People v. Harris*, 123 Ill. 2d 113 (1988). *Supra* ¶ 48. According to this decision, we do not "isolate the particular limitation on cross-examination to determine whether reversible error has occurred," but rather we review the "entire record" to determine if the fact-finder was made aware of "adequate factors concerning relevant areas of impeachment." *Harris*, 123 Ill. 2d at 145. The court "look[s] to the record as a whole and the alternative means open to the defendant to impeach the witness." *Id.* According to this decision, no confrontation clause violation occurs in prohibiting a particular area of inquiry on cross-examination if the defendant was permitted to pursue other areas of inquiry. *Id.* The majority also cites *United States v. Rogers*, 475 F.2d 821, 827 (7th Cir. 1973), for the proposition that the relevant question is " ' "whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony." ' " *Supra* ¶ 48 (quoting *Harris*, 123 Ill. 2d at 145, quoting *Rogers*, 475 F.2d at 827).

¶ 72        There are several problems with employing the *Harris* analysis here. First, the *Harris* test directly contradicts the test set forth earlier in the majority opinion. It cannot be the case both that a defendant " 'states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness' " (*supra* ¶ 45 (quoting *Van Arsdall*, 475 U.S. at 679)) *and* that a defendant who is prohibited from engaging in cross-examination designed to show a prototypical form of bias does *not* state a violation of the confrontation clause if a review of the entire record shows that he was able to pursue other areas of inquiry

(*supra* ¶ 48 (citing *Harris*, 123 Ill. 2d at 145). These are fundamentally incompatible inquiries.

¶ 73        Second, a *Harris*-type analysis was foreclosed by the Supreme Court in *Van Arsdall*. In that case, the Supreme Court explained that " 'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " *Van Arsdall*, 475 U.S. at 678-79 (quoting *Davis*, 415 U.S. at 316-17). When the Court looked at whether the defendant was denied his confrontation clause rights, the Court looked only to the fact that the defendant was denied the right to inquire into the witness's potential bias. The Court did *not* base its finding of a confrontation clause violation on whether the defendant was able to cross-examine the witness on other matters:

> "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' *Delaware v. Fensterer*, 474 U. S. 15, 20 (1985) (*per curiam*) (emphasis in original).

> In this case, however, the trial court prohibited *all* inquiry into the possibility that Fleetwood would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." (Emphasis in original.) *Id.* at 679.

After holding this, the Supreme Court did *not* consider whether defense counsel was able to cross-examine the witness on other matters or to otherwise test the truthfulness of his testimony. Rather, the Court held that the defendant was denied his confrontation clause rights because he was "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Id.* at 680. The Supreme Court then remanded the

case to the Delaware Supreme Court to determine whether the error was harmless beyond a reasonable doubt. *Id.* at 684.

¶ 74　　*Van Arsdall* thus makes clear that, when the Supreme Court spoke of the confrontation clause's guarantee of the opportunity for effective cross-examination in the context of exploring a witness's bias or motive to lie, the Court was speaking of the opportunity for effective cross-examination on *that particular matter*, not the opportunity for cross-examination in general. And, indeed, that is how this court applied the confrontation clause in *Blue*. After determining that the trial court had erred in cutting off all cross-examination on a subject crucial to determining witness bias, this court proceeded to determine whether the error was harmless. *Blue*, 205 Ill. 2d at 18. This court did *not* consider whether the defendant was able to cross-examine these witnesses on other matters or otherwise test the truth of their testimony. By contrast, the majority opinion suggests that the opportunity for effective cross-examination referenced by the Supreme Court in *Van Arsdall* simply means that defendant had the opportunity for effective cross-examination *in general* and, if he did, then it is perfectly appropriate for the trial court to prohibit him from engaging in cross-examination designed to expose a prototypical form of bias on the part of the witness. *Supra* ¶ 47. This view cannot be squared with *Van Arsdall* or *Blue*.

¶ 75　　Third, this court in *Harris* relied on federal cases that predated *Van Arsdall* and addressed a different type of confrontation clause challenge. See *Harris*, 123 Ill. 2d at 145 (citing *United States ex rel. Blackwell v. Franzen*, 688 F.2d 496 (7th Cir. 1982), *Rogers*, 475 F.2d 821, and *Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967)). These cases involved a defendant's right to cross-examine a witness who had asserted a privilege for part of his testimony. Both *Rogers* and *Fountain* involved a witness who asserted the fifth amendment privilege against self-incrimination for part of his or her testimony. See *Rogers*, 475 F.2d at 826; *Fountain*, 384 F.2d at 627; see also U.S. Const., amend. V. In this situation, the court needs to determine if the assertion of the privilege violates the defendant's right of confrontation to the extent that the witness's testimony must be stricken. As *Rogers* noted, the proper analysis for determining whether a defendant's sixth amendment right has been violated because of a witness's assertion of the fifth amendment privilege was stated in *Fountain*:

- 22 -

"Where the privilege is legitimately invoked by a witness during cross examination, all or part of that witness's direct testimony may be subject to a motion to strike. The ultimate inquiry is whether the defendant has been deprived of his right to test the truth of the direct testimony. *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). If he has, so much of the direct testimony as cannot be subjected to sufficient inquiry must be struck. The distinction is generally drawn between invoking the privilege as to 'collateral matters,' not requiring the striking of direct testimony, and invoking it as to 'direct' matters. [Citations.] But the line between 'direct' and 'collateral' is not clear, and the question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony." *Fountain*, 384 F.2d at 628.

See also U.S. Const., amend. VI.

¶ 76     Similarly, in *Franzen*, the defendant wished to cross-examine a state witness on a matter that was within the witness's attorney-client privilege. *Franzen*, 688 F.2d at 498-500. The court analyzed the issue by citing the analysis used by the courts in *Rogers* and *Fountain* and stated that the ultimate determination is "whether the probative value of the alleged privileged communication was such that the defendant's right to effective cross-examination was substantially diminished." *Id.* at 501.

¶ 77     In *Harris*, this court quoted the above cases out of context when determining whether the defendants' confrontation rights were violated when they were not allowed to engage in cross-examination designed to expose a witness's bias or motive to testify falsely. *Harris*, 123 Ill. 2d at 143-45. *Harris* did not involve a witness who had asserted a privilege for part of his testimony. In *Harris*, the defendants sought to question a witness about (1) his expectations that his good-time credit would be restored in exchange for his testimony against the defendants and (2) certain correspondence allegedly exchanged between the witness and the Director of Corrections about a transfer out of Stateville prison. *Id.* at 143-44. Although this court cited the inapposite analysis from the above federal cases, we ultimately resolved the issue on the bases that (1) the defendants had been given sufficient latitude to explore the witness's bias and (2) they had not been completely

precluded from cross-examining the witness about the good-time credits. *Id.* at 148. This is the type of inquiry that *Van Arsdall* requires. See *Van Arsdall*, 475 U.S. at 678-80.

¶ 78 Clearly, then, the federal cases this court cited and quoted in *Harris* were addressing a different type of confrontation clause challenge. As the Seventh Circuit itself has explained, the situation is different when a defendant's challenge implicates the confrontation clause's "core values":

"When a district court limits cross-examination, the first question is whether the limitation 'directly implicates the Confrontation Clause's core values' triggering *de novo* review. *United State v. Groce*, 891 F.3d 260, 267 (7th Cir. 2018); *United States v. Williamson*, 202 F.3d 974, 978 (7th Cir. 2000). Embedded in that question are two more—what are 'core values' under the Confrontation Clause, and when are they 'directly' implicated? This court has recognized that, among others, '[e]xposing a witness's motivation, biases, or incentives for lying' and '[i]mpeaching a witness' are core values. *Groce*, 891 F.3d at 267 (quotation omitted). And core values are 'directly' implicated when the district court denies a defendant a 'reasonable opportunity' to elicit impeaching or discrediting testimony. *United States v. Trent*, 863 F.3d 699, 705 (7th Cir. 2017). We have held that an opportunity is reasonable if the defendant *'merely ha[s] the chance to present a motive to lie,'* *Trent*, 863 F.3d at 705, or to elicit impeachment testimony. See *United States v. Clark*, 657 F.3d 578, 584 (7th Cir. 2011)." (Emphasis added.) *United States v. Hart*, 995 F.3d 584, 589 (7th Cir. 2021).

¶ 79 In later cases such as *Blue*, this court would correctly cite the *Van Arsdall* test as the proper analysis when assessing a claim that a defendant was denied the right to cross-examine a witness on bias or motivation to testify. See *Blue*, 205 Ill. 2d at 3-14. There is no reason for this court to revive the mistaken and inapposite *Harris* test. Rather, since the defendant has raised a challenge that directly implicates the confrontation clause's core values, we should be considering whether the trial court improperly cut off all inquiry into whether Officer Stapleton had a motive to lie. As *Hart* explains, this is a low bar to clear. The trial court merely has to give a defendant a chance to present a motive to lie before the trial court's discretion to further limit cross-examination arises. See *Hart*, 995 F.3d at 589. Here, the

appellate court found a confrontation clause violation because defendant did not get that chance. See 2021 IL App (3d) 150880-B, ¶¶ 55-59, 62.

¶ 80    Having framed the confrontation clause analysis incorrectly, the majority does not focus on the proper question: whether the trial court foreclosed all inquiry into whether Officer Stapleton had a motive to lie. Rather, the majority finds no confrontation clause violation because (1) allowing defendant to question Officer Stapleton about whether he feared the potential employment consequences of an unjustified shooting would have opened the door to prejudicial evidence being introduced against defendant and (2) defendant was not otherwise limited in his cross-examination of Officer Stapleton. Neither reason is a valid basis to reverse the appellate court.

¶ 81    The majority contends that the trial court was essentially saving defendant from himself by not allowing him to cross-examine Officer Stapleton about whether he feared that he would lose his job if the shooting was found to be unjustified. According to the majority, this would have opened the door to the results of the Joliet Police Department's deadly force review panel being admitted against defendant. Thus, the trial court's ruling was "necessary to avoid a highly prejudicial outcome to Pacheco." *Supra* ¶ 50. This was, of course, not the trial court's reason for barring defendant from cross-examining Officer Stapleton on this matter. Rather, as the appellate court explained, the trial court's sole basis for denying the questions was the trial court's misreading of *People v. Adams*, 2012 IL 111168. 2021 IL App (3d) 150880-B, ¶¶ 57-59. Moreover, it is not at all clear that the door would have been opened for the review panel's decision to be admitted. Without knowing what questions the trial court would have allowed, we simply do not know. For instance, defense counsel at one point asserted that he wanted to ask Officer Stapleton whether, in his mind, after he shot defendant, he was concerned that the shooting could have had a detrimental impact on his employment. Counsel then stated, "if he says no, fine. If he says yes, fine. But I am asking him did your actions on that day give you a reason to lie." If defense counsel had merely asked Officer Stapleton a question about his state of mind in the aftermath of the shooting, it is not clear why this would have opened the door to the results of the review board's decision being admitted. And, as the majority notes, the trial court had stated its intention not to allow those results to be admitted, so presumably the trial court

- 25 -

would have exercised its discretion to limit cross-examination on this matter before the door was opened.

¶ 82    More importantly, though, the majority never explains what any of this has to do with the confrontation clause. Either defendant had a right to explore this area on cross-examination, or he did not. Either the trial court was entitled to cut off all inquiry into this matter, or it was not. Even if the door was opened to the review panel's decision being admitted, this was the defense's strategic choice to make. Presumably, since defendant's theory of the case was that Officer Stapleton had fabricated a false story to cover up an unjustified use of force, defense counsel would have argued that Officer Stapleton was lying to the review panel, too. Regardless, however, the majority simply fails to explain how this is relevant to whether defendant's confrontation rights were violated.

¶ 83    The majority also points out that defense counsel was not otherwise limited in his cross-examination of Officer Stapleton. *Supra* ¶ 51. As I will explain, I find this relevant to whether the confrontation clause error was harmless, not to whether there was error in the first place. The majority highlights other questions that defense counsel asked that went to Officer Stapleton's credibility and the reasonableness of his actions. *Supra* ¶ 51. The majority also points out that defense counsel was allowed to argue to the jury that Officer Stapleton was " 'out of control' " and acting to protect his own interests. *Supra* ¶ 51. Thus, the "jury in this case was made amply aware of facts that bore upon the reliability and credibility of Stapleton's testimony and the propriety of his conduct on the day of Pacheco's pursuit and arrest." *Supra* ¶ 51. This reasoning is a direct result of the majority's application of the *Harris* test, where this court looks to the record as a whole to determine if the defendant was adequately able to test the truth of the witness's testimony. As explained above, this test was designed to address a different type of confrontation clause challenge. It has no place here, where defendant is alleging that the trial court's limitation of cross-examination directly implicated the confrontation clause's core values. Here, this court's initial focus must be on whether the trial court foreclosed all inquiry into whether Officer Stapelton had a motive to lie. See *Van Arsdall*, 475 U.S. at 678-80.

¶ 84    Because the trial court completely denied defendant the opportunity to explore whether Officer Stapleton had a motive to lie, I agree with the appellate court that

defendant's right of confrontation was violated. See 2021 IL App (3d) 150880-B, ¶¶ 55-56. However, that does not end the inquiry. As the Supreme Court explained in *Van Arsdall*, the denial of a defendant's right to impeach a witness for bias is subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684. Factors that reviewing courts should consider include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* The first two of these factors weigh in defendant's favor. Officer Stapleton was the most important witness in the prosecution's case, and there was no other testimony about whether he had a motive to lie.

¶ 85 The final three factors, however, weigh in favor of finding the error harmless. As the majority notes, there was other evidence that tended to corroborate Officer Stapleton's account of the shooting. *Supra* ¶¶ 18-26. Moreover, the factors that the majority finds relevant to determining whether there was a confrontation clause error, I believe are relevant in considering whether the confrontation clause error was harmless. See *supra* ¶ 51. As the majority explains, defense counsel was not otherwise limited in his examination of Officer Stapleton. He was able to question him extensively about his memory of events, including his position and location during the shooting. He also "challenged the reasonableness of firing his weapon and whether he harbored any animus toward Pacheco." *Supra* ¶ 51. Defense counsel also argued to the jury that Officer Stapleton should not be believed because he was "out of control" and acting to protect his own interests. But the jury clearly did not believe this. The jury obviously found Officer Stapleton credible and believed his account of the shooting.

¶ 86 Finally, the case against defendant was strong.[1] Officer Stapleton's testimony was corroborated by other evidence, including the testimony of two witnesses who confirmed that defendant's car was moving before Officer Stapleton began firing.

---

[1]The majority claims as a matter of established fact that defendant "tried to hit a Joliet police officer with his car." *Supra* ¶ 1. However, it was a contested factual issue at trial whether defendant's car was even moving when Officer Stapleton discharged his weapon. And the jury's acquittal of defendant on the charge of attempted aggravated battery of Officer Stapleton is a strong indication that the jury did not believe defendant was trying to hit Officer Stapleton with his car.

- 27 -

And as the State points out, although neither witness testified that they saw Officer Stapleton standing in front of defendant's car, that is a reasonable inference from the evidence that Officer Stapleton was yelling at defendant to stop, that defendant was yelling to get out of his way, that Officer Stapleton can be seen in surveillance video running away from defendant's car, and the photographs showing that Officer Stapleton shot through defendant's windshield. Given all of this, it is difficult to believe that defense counsel being allowed to ask Officer Stapleton whether he believed that the shooting could have had a detrimental impact on his employment would have made a difference in the outcome of the trial. Thus, I would find the trial court's error harmless beyond a reasonable doubt.

¶ 87    Accordingly, I agree with my colleagues that the appellate court's decision should be reversed. However, I would resolve the confrontation clause issue on the basis of harmless error. I agree with the majority's resolution of the second issue.

¶ 88    JUSTICES HOLDER WHITE and O'BRIEN join in this special concurrence.